UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES of AMERICA, Plaintiff, | ) | COURT FILE NO. 26-MJ-23 (DLM) |
| vs. | ) | |
| (1) ALFREDO ALEJANDRO ALJORNA, | ) | Courtroom 6B |
| (2) JULIO CESAR SOSA-CELIS, | ) | Wed., January 21, 2026 |
| Defendants. | ) | St. Paul, Minnesota 9:00 A.M. |

*** * * REDACTED TRANSCRIPT * * ***

**PRELIMINARY & DETENTION HEARING**

**BEFORE THE HONORABLE DOUGLAS L. MICKO**
**UNITED STATES MAGISTRATE JUDGE**

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota 55101
651.848.1224

**A P P E A R A N C E S:**

**For the Government:** **OFFICE OF THE U.S. ATTORNEY**
By: SYNGEN KANASSATEGA
Assistant U.S. Attorney
600 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

**For Defendant (1) Alfredo Aljorna:**

**GOETZ & ECKLAND, P.A.**
BY: FREDERICK J. GOETZ, ESQUIRE
615 1st Avenue NE - Suite 425
Minneapolis, Minnesota 55413

**For Defendant (2) Julio Cesar Sosa-Celis:**

**SAPIENTIA LAW GROUP, PLLC**
BY: ROBIN M. WOLPERT, ESQUIRE
120 South Sixth Street - Suite 100
Minneapolis, Minnesota 55402

**Interpreters:** **Marianne McEvoy**
**Esperanza Lopez-Dominguez**

(9:00 a.m.)

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendants present, in custody)

THE COURT: Thank you. Please be seated.

This is United States District Court for the District of Minnesota. I'm Magistrate Judge Doug Micko. And we are here this morning in the matter of United States vs. Alfredo Alejandro Aljorna and Julio Cesar Sosa-Celis.

I see we have an interpreter with us here today, so at this time I'll swear in our interpreter.

**MARIANNE McEVOY, INTERPRETER, SWORN**

THE INTERPRETER: I do, Your Honor.

THE COURT: And with that, let me get appearances of counsel, starting with the Government.

MR. KANASSATEGA: Good morning, Your Honor. Syngen Kanassatega on behalf of the United States.

THE COURT: Good morning, Mr. Kanassatega.

And how about on behalf of Mr. Aljorna?

MR. GOETZ: Good morning, Your Honor. Frederick Goetz by appointment on behalf of Mr. Ositega (ph). He is present to my right.

THE COURT: Good morning to you, Mr. Goetz. And it's Mr. Aljorna, is that right?

MR. GOETZ: I'm sorry, Your Honor.

THE COURT: No problem.

MR. GOETZ: I stand corrected.

THE COURT: Okay.

MR. GOETZ: And I'm not sure if the order for appointment has gone through, but --

THE COURT: I think it has gone through, but if it hasn't, the order will be granted. Thank you.

And how about on behalf of Mr. Sosa-Celis today?

MS. WOLPERT: Good morning, Your Honor. Robin Wolpert on behalf of Mr. Celis, and he is seated to my left, and again by appointment.

THE COURT: And good morning, Ms. Wolpert. Good morning again, Mr. Sosa-Celis.

DEFENDANT SOSA-CELIS: Good morning.

THE COURT: Mr. Aljorna and Mr. Sosa-Celis, as we talked about last week, we're here for two reasons.

One, you have a right to a preliminary hearing. Sometimes that's called a probable cause hearing where I would determine based on testimony and evidence before me whether there's probable cause to believe that you committed violations that are alleged in the complaint. If I were to make such a finding, then we will turn to the issue of detention or release for both of you at the detention hearing portion of our proceeding today.

Mr. Kanassatega, anything you can tell me about your understanding of how we're proceeding here today?

MR. KANASSATEGA: Your Honor, the Government continues in its motion for motion for pursuing detention for both defendants and the Government will be calling one witness, FBI Special Agent Terry Getsch.

THE COURT: Okay. Before you do that, let me just check in with counsel for both defendants.

Mr. Goetz, is it Mr. Aljorna's intention to go forward with the preliminary hearing today?

MR. GOETZ: It is, Your Honor.

THE COURT: And Ms. Wolpert, I'll ask you the same thing on behalf of --

MS. WOLPERT: So are we, yes.

THE COURT: All right. Okay. Mr. Kanassatega, then why don't you call your first witness.

MR. KANASSATEGA: Your Honor, the Government calls FBI Special Agent Terry Getsch.

**TERRY GETSCH, GOVERNMENT'S WITNESS, SWORN**

THE WITNESS: Yes, Your Honor, I do.

THE COURT: Okay. Thank you. If you could have a seat and state your full name and please spell it for our court reporter, I'd appreciate it.

THE WITNESS: Yes, Your Honor. Special Agent Terry, T-E-R-R-Y, Getsch, G-E-T-S-C-H.

THE COURT: Whenever you're ready, Mr. Kanassatega.

MR. KANASSATEGA: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. KANASSATEGA:

Q. Good morning, sir.

A. Good morning, sir.

Special Agent Getsch, could you introduce yourself to the Court by letting us know who do you work for.

A. Yes, sir. I'm a Special Agent with the Minneapolis FBI Office, assigned --

Q. And --

A. Sorry. Go ahead, sir.

Q. And what are your duties and responsibilities as a Special Agent with the FBI?

A. Yes, sir. I'm currently assigned to work violent crime, to include assaults on federal law-enforcement officers.

Q. And is your -- will your testimony -- is it my understanding -- it's my understanding that your testimony today will be based on your own investigation; am I correct?

A. Yes, sir, that is correct.

Q. And also based on information that you learned from other law-enforcement officers?

A. Yes, sir.

Q. And your review of other evidence obtained by law-enforcement officers in this case, is that correct?
A. Yes, sir.
Q. Special Agent Getsch, I'd like to turn your attention to the events that are before us. On the evening of January 14th, could you tell us what happened.
A. Yes, sir. So approximately 6 p.m. on the 14th an Enforcement and Removal Operations team consisting of about ten different people was conducting -- assisting in Enforcement Removal Operations in the area of Minneapolis, Minnesota.
THE WITNESS: Yes, sir.
THE COURT: I hate to interrupt you, Agent Getsch, but I want us to be mindful of the fact that we have a court reporter as well as an interpreter here, so --
THE WITNESS: Yes, Your Honor.
Q. -- if you can speak about three-quarters as fast as you normally would, I'd appreciate it.
THE WITNESS: Yes, Your Honor.
A. There were specifically two ERO officers working for ICE -- Immigration and Customs Enforcement -- as Enforcement and Removal Officers, or deportation officers, that were in an unmarked ERO vehicle equipped with emergency equipment that were assisting in removal operations.
They came across a license plate that they then

communicated with other ERO officers and through access with other databases accessible to ICE. They had identified what they believed to be an individual, a third party whose name I can provide if you would like, that was not believed to be a United States citizen, was a citizen of another country and they did not have any record of a legal crossing through a point of entry, so they believed him to be here illegally. And they compared his driver's license to that of the individual driving a gray in color I believe Ford sedan, and they believed that he was driving that vehicle and they determined it appropriate to conduct a traffic stop to identify this individual and potentially remove him, or start his removal proceedings.

Q. And what happened when they initiated a traffic stop?

A. So they went to initiate a traffic stop. After they attempted to initiate the traffic stop the individual fled. The ERO officers estimated for approximately 15 to 20 minutes. One of the defendants, actually Mr. Aljorna, who was driving that vehicle, identified that he thought it was between 25 and 30 minutes.

He then fled from the scene zigzagging through traffic. In his own statement to me that was a post-Miranda statement, he said that he ran through multiple stop signs.

MR. GOETZ: Your Honor, objection. At this point it's not responsive. He's not saying what happened.

THE COURT: Thank you. The objection will be overruled, but Mr. Kanassatega, if you can just make sure that we don't have narrative answers to questions like that, I'd appreciate it.

BY MR. KANASSATEGA:

Q. How fast was the driver driving?

A. Up to speeds of 80 miles an hour.

Q. And where did the pursuit ultimately end?

A. It ended in the vicinity of I believe it was [redacted] in Minneapolis.

Q. And how did the pursuit end?

A. It ended when the vehicle essentially crashed into a snowbank. And the subject they were pursuing, it was a vehicle that was believed to only be occupied by the driver. Nobody else was in the vehicle.

He got out of the vehicle and fled on foot to a house that was essentially about a half a block down or several houses down from where the vehicle crashed at the corner of the intersection.

One of the ERO officers got out on foot and pursued him on foot. That was the driver of the ERO vehicle. He pursued him on foot towards the residence located in the vicinity of -- I believe the actual address is [redacted]. The second ERO officer who was the passenger in that ERO vehicle got out to check the subject's vehicle and

there was nobody else in the vehicle. Then he had to get in the driver's seat of that vehicle and then he assisted in pursuing as well.
Q. And just to be clear, who was the individual that was driving the silver sedan?
A. He was later identified to be Mr. Aljorna.
Q. And tell us what happened next.
A. As Mr. Aljorna ran into the essentially front yard up towards the stairs approximately ten to 20 feet from the residence, he slipped on ice and fell and then was attempted to be apprehended by the first ERO officer that was the original driver of the vehicle in pursuit and a struggle ensued between the two of them.
Q. Who else was nearby?
A. The friend and associate, Mr. Sosa-Celis, was standing in the doorway of the residence as they were approaching it. Additionally the two girlfriends of both Mr. Aljorna and Mr. Sosa-Celis, and then there was other residents that were inside of the house or apartments as well.
Q. What, if anything, did Mr. Sosa-Celis say to Mr. Aljorna?
A. Something to -- there were statements made throughout the struggle for the ERO officer to get off of Mr. Aljorna, and then additionally there was -- essentially he knowingly was trying to get him into the house, to help him get into

the house, because they had just exchanged a phone call.
Q. Let's take a step back.
A. Yes, sir. What happened after Mr. Aljorna slipped and fell as you described before?
A. The ERO officer attempted to effect the arrest and engaged -- was physically trying to restrain Mr. Aljorna.
Q. And what happened during the attempt to restrain Mr. Aljorna?
A. He was initially on top of Mr. Aljorna. He then was -- essentially the fight or struggle that was on the ground rolled over and he was on his back with Mr. Aljorna on top of him. At this time there's a third party, not Mr. Aljorna, that he had seen on the stoop that had been talking to Mr. Aljorna as they were running up. Additionally, that ERO officer was giving commands, law enforcement commands, in both Spanish and English, advising him to essentially stop and comply with the arrest. He did not stop or comply with the arrest.

And then as he is struggling and then on his back there is -- the individual that was on the -- I believe to be on the door stoop initially had a snow shovel in his hands and he started getting struck by the snow shovel, and then a mixture of either that individual or another individual then grabbed a broom that was in the area and he's being struck with the broom as well. So he's being

struck by what he assesses to be multiple individuals.

It was extremely dark in that front area right in front of the house and he had trouble seeing what we believe was his assailants and Mr. Aljorna.

Then he's actually getting struck. He's receiving strikes to his face and he said those strikes were painful and he believed it was from a broom or the broom handle.

And he eventually is laying on his back and using his left hand -- he's right-handed -- with his gun, pistol, on his right hip. He uses his left hand to shield from getting hit to the face by one of the brooms. He actually sustains a gash to that hand. I've seen pictures of that gash and it corroborates with the statements that he's providing.

He -- go ahead, sir.

Q. Who struck ERO Number 1 with the red broom?

A. He believes it to be Mr. Aljorna.

Q. And who struck ERO Number 1 with the snow shovel?

A. We believe it to be Mr. Sosa-Celis.

Q. Tell us what happened after ERO Number 1 suffered the gash to his hand.

A. He then identified -- so it's around the same time frame he's getting struck and Mr. Aljorna was able to -- he had like a sweater or jacket on and was able to get away from the grip of the ERO officer, that ERO officer obviously

realizing that he was losing the fight. He was on his back. He was also losing grip of Mr. Aljorna.

He yelled out to the other ERO officer and he received no response and he realized that he was by himself and did not have immediate backup and he was in fear for his safety at the time is what he expressed to the FBI during his interview.

So he lost control of Mr. Aljorna. Mr. Aljorna -- he saw what he says was essentially a scowl and angry look on his face as he looked back at the ERO officer who was laying on the ground. Both individuals initially had the -- well, Mr. Sosa-Celis had a shovel. Mr. Aljorna is assessed to have a broom or broom handle in his hand at the time. And then Mr. Aljorna continued to strike him with his hand up and that's when he believed to receive the gash to his hand. He struggled to draw his pistol from his belt and essentially simultaneously as he's drawing to fire in their direction and having a hard time acquiring them because of how dark it is, they drop the shovel and broom and run into the house and he was uncertain if he struck either of the individuals with that one gunshot, and then shortly after that is when the other ERO officer arrived on scene with him.

Q. We'll come back to the broom and the snow shovel later. What happened after they ran into the residence?

A. After they ran into the residence, Mr. Aljorna and Sosa-Celis, their girlfriends or significant others, and two children between I believe the age of one and three went up to [redacted], the upstairs apartment, which was their apartment, and they bunkered down initially in the front room.

Other responding HSI tactical units, ERO officers and everybody else arriving to the scene deployed gas and other techniques in trying to get them out of the residence, and they moved from that front bedroom into a rear bedroom in the residence. They barricaded the door with a TV stand to prevent anybody from getting in.

Officers and agents with the Department of Homeland Security went inside, attempted to gain entry into that back bedroom and they initially were not able to gain entry because of the barricade due to the deployment of gas and what was told to me to be the safety and concerns for the children.

Eventually Mr. Aljorna and Sosa-Celis surrendered to DHS and they were detained at that time.

Q. After they were detained, tell us about what -- the investigation that took place on scene after they were detained.

A. Initially interviews were attempted with anybody who was identified. FBI was notified, responded to the scene.

Minneapolis Police Department had been called through various 911 calls by the girlfriends and they were on scene as well. So there's a mixture of ERO, DHS, FBI, and Minneapolis Police Department. They attempted to set up a corridor. We had our FBI evidence response team in conjunction with the BCA, Bureau of Criminal Apprehension, Force Investigation Unit, that were setting up the crime scene and attempting to initiate the investigation of everything that happened.

Some interviews were attempted or done on scene, but due to a completely chaotic scene, threats to the agents, loss of vehicles at the time, they were unable to obtain a search warrant and execute a search on the residence and they had to evacuate the location due to safety concerns for the individuals involved.

Q. You mentioned a couple of things and let's take those one by one.

A. Yes, sir.

Q. You mentioned the Evidence Response Team. What did the Evidence Response Team find on scene?

A. So I spoke with the Evidence Response Team team leader. They initially set up essentially portable lighting to enhance the lighting and ability to see what was going on in front of the residence where the assessed assault occurred, and they set up a 3D scanner to scan that crime scene.

They took initial crime scene photographs that captured two brooms that were strewNs about in the front yard area where the assessed altercation occurred, and they additionally had a snow shovel matching the description of what was used in that area as well, so three different items.

There's other evidence of a struggle, broken watch band and other things, and then they conducted exterior photographs of that scene. And my review of those photographs and what I was told by the ERT search team leader is the location of what assessed to be the struggle outside in the snow and the strewn-about items corroborates what was provided by the defendants and by the ERO officer.

Q. You also mentioned interviews. Who was interviewed?

A. Various interviews, specifically the two ERO officers that were involved, so the ERO officer that was involved in the direct assault and another ERO officer that was his passenger in the vehicle that was responding. Mr. Sosa-Celis, Mr. Aljorna, their girlfriends, one of the residents at least in the Unit 1 apartment below them, and various other neighbors or other individuals that were involved.

Q. I'll ask you about some of those one by one.

First of all, what did -- you mentioned that an interview of Mr. Sosa-Celis was conducted.

A. Yes, sir.
Q. What did Mr. Sosa-Celis say?
A. So I conducted an interview of Mr. Sosa-Celis at the hospital after he had received some initial medical treatment. Through the use of an interpreter -- and this is a recorded body-worn camera interview with the Bureau of Criminal Apprehension -- we interviewed him, Mirandized him. He understood and waived his right to have an attorney present and spoke with us, and he provided a statement, additionally providing consent to search his phone and providing his cell phone to us.

He identified that he had received a phone call that day from Mr. Aljorna, and Mr. Aljorna knew that he was being followed by ICE and he was about to be stopped by ICE and he was driving around. Mr. Aljorna -- sorry -- Mr. Sosa-Celis knew that there was status issues with both his status and Mr. Aljorna's status in the United States, that they believed they would be subject to removal if contacted by an ICE officer.

And they were working at night doing food delivery for I believe Door Dash. Both individuals would work at night to try to not get caught by ICE.

Mr. Sosa-Celis said that he received a phone call from Mr. Aljorna, who was out working at the time, or he believed he was out working at the time, and --

THE INTERPRETER: I apologize. The interpreter needs a repetition of the last two sentences.

A. Yes. So Mr. Aljorna, who was driving the vehicle, called Mr. Sosa-Celis, said he was driving around and he was being followed by ICE and was about to be stopped by ICE.

Then Mr. Sosa-Celis heard what he believed to be like sirens or lights and a traffic stop happening, and then he was aware that Mr. Aljorna was running from ICE and he fully knew that they were ICE, both parties knew that they were ICE and they were attempting to stop him and he wanted to help his -- he said his cousin, but clarification was not -- there's no blood relation.

And he told them to head -- Mr. Aljorna, who was driving, to head back to their residence and he would meet him there.

He then identified that while he was essentially sitting in the front doorway of that residence, which is [redacted] in Minneapolis. So Mr. Sosa-Celis is at that residence. Mr. Aljorna is driving.

Mr. Sosa-Celis believes he identified ICE vehicles -- in his description like ICE agents that were attempting to stop Mr. Aljorna and he saw Mr. Aljorna's vehicle what he thought run into a telephone pole and essentially crash near the corner near his house and he could witness the crash.

He then saw who he believed to be an ICE agent

pursuing Mr. Aljorna from the vehicle up into that front area in front of the house and then saw Mr. Aljorna fall to the ground and the altercation that happened with the ERO officer.
Q. What did Mr. Sosa-Celis say about the snow shovel?
A. Mr. Sosa-Celis said that he was holding a snow shovel in his hands during this time, but he denied ever using the snow shovel.
Q. In regards to -- staying within the interview, your interview with Mr. Sosa-Celis, what did Mr. Sosa-Celis say about what he saw Mr. Aljorna do?
A. He saw -- essentially saw him rolling over the -- he was fighting -- Mr. Aljorna was fighting with ERO officer, and at one point he saw Mr. Aljorna with a broom in his hand, and then in Mr. Sosa-Celis's view, he was either attempting to or striking the ERO officer or the ICE agent, in his understanding, while this altercation is happening.
Q. I want to ask you now about the interview that was conducted with Mr. Aljorna.
A. Yes.
Q. What did Mr. Aljorna say in the interview?
A. Mr. Aljorna was interviewed at the Whipple Building later on. We had an interpreter. He waived his Miranda rights and he provided a full statement to us that day and later on that day, two different interviews.

He identified that he'd been driving around and he observed who he believed was ICE approaching him and he'd been driving up next to him and identifying him in the vehicle, that he essentially identified these ICE agents as pointing at him as he was driving.

Eventually these ICE agents attempted a traffic stop and he saw emergency lights and he knew that he was getting stopped by ICE agents and he did not want to stop and did not want them to detain him, so he fled from the location.

In his understanding, he believed he fled for approximately 25 to 30 minutes. He blew through multiple stop signs but said he never put anybody at risk. And then he -- whenever he would come to a stop light, if it was a red light, he would just take a right to go through the stop light.

He essentially fled around the city and he also called Mr. Sosa-Celis at that time and was told to go back to the residence and to meet him back at the residence. So eventually he made his way back to [redacted]. It seemed very clear from the communications that he was having over the phone that Mr. Sosa-Celis was intending to help him evade ICE arresting him and that's why he wanted him to get back to his house.

Q. What did Mr. Aljorna say about the altercation with the

ERO Number 1?
A. He essentially -- lining up with other statements, he said he crashed into a snow bank. It was right next to -- reviewing photographs, it's right next to a light pole. He crashed into the snow bank, he got out, he started running into the house. He slipped. He was essentially tackled or taken down, was trying to be apprehended by the ERO officer that was pursuing him.
The officer was initially on top of him and then he was able to slip or somehow get the officer underneath him and he rolled over on top of the officer.
He did not recall specifically Mr. Sosa-Celis grabbing him or pulling him off because he's obviously involved in the struggle.
Eventually, though, he said he was able to break free from the ERO officer's grasp because of the jacket or shirt that he was wearing and get away from him.
And then he remembers grabbing a broom that was in the vicinity, and in his general statement he threw it in the general direction or back towards the ERO officer, but he denied every hitting the ERO officer with that broom. And then he fled inside the residence.
Q. And I'm sorry. Just for the record, I forgot to ask this.
Going back to your interview with Mr. Sosa-Celis,

you mentioned that he was receiving treatment. What was Mr. Sosa-Celis receiving treatment for?
A. It's essentially my understanding he had received either fragmentation or something from a gunshot wound to his right upper thigh. He was treated and he was actually released back to the Whipple Building fairly quickly. Honestly, he almost beat me getting back to the Whipple Building from the hospital.
Q. And lastly, you mentioned that interviews were conducted of the girlfriends of Mr. Aljorna and Mr. Sosa-Celis.
A. Yes, sir.
Q. What did the girlfriends say?
A. They were both in essentially the threshold area or the same vicinity of Mr. Sosa-Celis when Mr. Aljorna was running from ICE as he approached the house. They observed the altercation with who they believed at the time to be ICE agents and then later confirmed that they were ICE agents as they're barricaded in the house and observed the placards of the ICE agents that were surrounding their house through the window.
One of the girlfriends' I believe was not sure if any weapons were used in the altercation or the struggle that happened between Mr. Aljorna and the ERO officer. The other one did not believe there was any weapons used.
There was also -- so then they identified that

there was a gunshot and there was conflicting statements of whether the door was open or closed between the two of them when the gunshot happened, and then Mr. Sosa-Celis had the gunshot wound to his leg.

They then identified and corroborated that everybody then went upstairs, and so the four adults and the two children went into an upstairs bedroom, initially into a front bedroom. Then due to OC gas or other deployments that were being utilized in the house to get them out, they went to a back bedroom where they essentially bunkered down until they eventually surrendered to DHS personnel.

Q. What, if any, kind of camera footage was obtained throughout the investigation?

A. So the Minneapolis Police Department in the city have cameras throughout the city. They're oftentimes at intersections or high-crime areas. There is a camera -- I believe it's in the vicinity of the intersection of where the wreck occurred, the captured portions of the incident. We believe it's a mixture of essentially the panning of the camera by either the police department or monitoring personnel trying to capture the incident, the nighttime issues with the lens and the distance from the camera, but parts of the incident are captured, but not the entirety of the incident was captured, and it was reviewed -- initially reviewed by an FBI agent.

Q. And what does the camera footage show?
A. It shows portions of the struggle that occurred in the front, essentially -- it shows Mr. Aljorna fleeing the vehicle, being pursued by the ERO officer up to the residence. It appears to show three individuals, assessed to be Mr. Sosa-Celis, Mr. Aljorna, and the ERO officer in the front yard struggling, and then appears to be a physical altercation. And then you see essentially the camera's out of view of the incident and then back on it, and when it returns it shows what's believed to be the ERO officer on his back with two other individuals running towards the vicinity of the house that is out of view and essentially fleeing away from him.
Q. Special Agent Getsch, are Mr. Aljorna and Mr. Sosa-Celis subject to immigration detainers from the Immigration and Customs Enforcement?
A. Yes.
MR. GOETZ: Objection. Relevance grounds, Your Honor.
THE COURT: Sustained.
BY MR. KANASSATEGA:
Q. I'll finish this up, Special Agent Getsch.
Special Agent Getsch, based on your training and experience, does probable cause exist to believe that Mr. Aljorna and Mr. Sosa-Celis aided and abetted each other

to forcibly assault, resist, oppose, impede, intimidate and interfere with ERO Number 1, who was engaged in the performance of his official duties?

MR. GOETZ: Objection, Your Honor. That's --

THE COURT: Sustained.

MS. WOLPERT: Same, Your Honor.

MR. KANASSATEGA: Your Honor, no further questions.

THE COURT: Thank you. Mr. Goetz, whenever you're ready.

MR. GOETZ: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. GOETZ:

Q. Good morning, Special Agent Getsch.

THE COURT: Excuse me for a second, Mr. Goetz.

Sir, you can just remain seated.

(Defendant Aljorna is seated)

BY MR. GOETZ:

Q. Am I pronouncing that correctly?

A. Getsch, yes, sir. Good morning.

Q. Our names are similar.

A. Yes, sir.

Q. Did you prepare any 302 related to your work in this case?

A. A majority of my documentation I believe is still pending due to outstanding transcriptions or other reasons.
Q. So have you prepared any reports, any summaries?
A. I don't think I've had anything finalized for this case so far.
Q. Finalized or not, have you prepared any rough reports? Have you prepared anything that memorializes the work that you did --
A. They're in process. Some are in process, yes.
MR. GOETZ: Your Honor, I move for disclosure of that, 18 U.S.C. 3500(b).
THE COURT: Give me just a second, Mr. Goetz.
(Pause)
MR. GOETZ: It's the Jencks.
THE COURT: No, understood. And, Mr. Goetz, what's your authority for the proposition that the Jencks Act applies to preliminary hearings?
MR. GOETZ: I think it doesn't qualify. The Jencks Act does not qualify to any type of hearing. When the Government calls a witness -- after a witness is called by the United States, has testified on direct examination, the Court shall on motion of the defendant or United States produce any statement. It doesn't say trial, doesn't say preliminary hearing, doesn't say motions hearing. Any time the Government calls a witness I believe the Jencks Act

applies.

THE COURT: Understood. Well, the way -- I read that a little bit differently, Mr. Goetz. I think that the Jencks Act isn't just codified under 3500. It's also Rule 26.2 that would require a statement be provided if it's -- "a written statement made, signed, otherwise adopted or approved, substantially verbatim, recorded recital of the statement or a statement to the grand jury," and I didn't hear Agent Getsch speak to that level of detail, so the motion is denied.

MR. GOETZ: Okay. I think the Jencks Act is broader, includes reports, but I understand the Court's ruling. We'll move on.

BY MR. GOETZ:

Q. So you are not the affiant in support of the complaint in this case, that's a colleague of yours, is that right?

A. Yes.

Q. Timothy -- is it Schanz?

A. Yes, sir.

Q. Have you read Special Agent Schanz' affidavit?

A. We jointly wrote the affidavit.

Q. Okay. So you, I trust, would agree everything in there is true and correct.

A. To my knowledge, yes.

Q. All right. Let's start with a little background.

First, Mr. Aljorna. My understanding from your testimony and reading the complaint is that this was not a targeted arrest circumstance, is that right?
A. Could you elaborate what a targeted arrest would be?
Q. Sure. This was a traffic stop, as you said, correct?
A. It was -- they were targeting, I believe, an individual that they thought was driving.
Q. And distinguishing that from a detail where Mr. Mr. Aljorna was a specific target of an arrest operation; in other words, agents were going to his house to arrest this individual.
A. It was not a preplanned operation to my knowledge, no.
Q. Okay. So Mr. Aljorna was not THE individual, but ICE had previous information, had a criminal history, correct?
A. I'm not sure of the review of criminal history. I'm just aware of the general nature of -- at the time that they contacted him, they weren't aware what his identity was. So until they apprehended him, they didn't know who he was.
Q. They didn't know anything about him, correct?
A. To my knowledge, no.
Q. No suggestion he had some kind of gang ties or anything like that, correct?
A. I mean, that could have been in their records, but they weren't -- the officers responding did not know who -- they thought it was somebody else and obviously is Mr. Aljorna.

Q. They had ho history or knowledge of history that this individual had any kind of warrants out for him, right, Mr. Aljorna, prior to stopping his car or attempting to stop --
A. To my knowledge, the two ERO officers specifically involved did not have access or knowledge of that information.
Q. Okay. And today before you testified, I take it you ran Mr. Aljorna's criminal history.
A. At some point previously. It's been ran and provided because it's a requirement for pretrial.
Q. All right. And you would agree he has no history of any kind of crimes of violence, no convictions.
A. To my knowledge, I believe that's correct.
Q. Okay. No history of bench warrants?
A. I'm not certain on bench warrants.
Q. You can't speak in the affirmative that he has a history of failing to show up for court.
A. I cannot, no.
Q. All right. So let's talk about ERO Number 1. Are you familiar with his background?
A. Just the fact that he's currently working as a deportation officer. I don't know very much about him.
Q. Does he have any history of law enforcement training other than whatever it took to be an ICE agent?
A. I'm not aware of that right now.

Q. Do you know if he's had any training in use of force?
A. I'm not directly familiar with their training path, but that's a general requirement of any law enforcement training, federal or state.
Q. You've had use-of-force training, correct?
A. Extensive, yes.
Q. All right. And you're familiar with the standards that apply to use of deadly force?
A. It's various -- so I'm familiar with the Department of Justice and with Georgia's use-of-force policy. DHS has their own use-of-force policy. I'm not familiar with the DHS's use-of-force policy.
Q. All right. Well, let's talk about the Supreme Court's policy, ***Tennessee vs. Garner***. Are you familiar with that standard?
A. Generally speaking, yes, sir.
Q. All right. That applies to every agent in the country, correct, state, federal?
A. Yes.
Q. It's the Constitution, right?
A. Yes, sir.
Q. And it provides that an officer cannot use deadly force to stop flight alone, correct?
A. Yes, sir.
Q. All right. The officer has to have a significant --

they have to have probable cause to believe there's a significant threat of death or serious bodily harm to the officer or somebody else, right?
A. Yes, sir.
Q. And there is no absolute immunity for ICE officers, correct?
A. I'm not an attorney. I do not believe so, though.
Q. ERO Number 1, he used deadly force in this case, correct?
A. He fired his weapon, which would be considered to be the use -- utilized deadly force, yes, sir.
Q. Okay. And he did that -- his -- I think as I understood your testimony, his explanation of why he used the deadly force is he claimed he had fear of death or great bodily harm, right?
A. Generally speaking, that is my understanding.
Q. And his basis for that alleged fear was his claim that Mr. Aljorna was striking him -- in part was striking him with physical objects, a broom, correct?
A. Yes.
Q. And he also claimed that another individual was striking him as well, or was it just Mr. Aljorna?
A. He believed he was being struck by two different individuals at least, one with a shovel and at least one other one with a broom, if my recollection is correct.

Q. So it's that use of force that gives rise to his claimed justification for use of deadly force, correct?
A. I'm not making an analysis in reference to the application of deadly force. That would be something for DHS/OIG and for DOJ Main.
Q. I'm not asking for analysis. I'm just asking for what he said.
A. It's not within the scope of my investigation.
Q. I'm just asking what he said. Did he claim that anybody else was using force against him to justify his shooting his weapon?
A. Anybody else aside from the assailants that I've mentioned? No.
Q. And the force he described for Mr. Aljorna and the other individual was getting struck with these objects, a broom or a shovel, correct?
A. The force of the two defendants, yes, sir.
Q. Okay. He didn't claim that they had any knives, correct?
A. To my knowledge, no.
Q. He didn't claim they had any firearms --
THE INTERPRETER: I apologize. The interpreter did not hear the answer.
A. To my knowledge, no.
THE COURT: Counsel and Agent, I'd ask you just to

try to be mindful of slowing down a little bit. We're trying to get our court reporting --

THE WITNESS: Yes, Your Honor. My apologies.

THE COURT: Thank you.

MR. GOETZ: Thank you, Your Honor.

THE COURT: You know, we're switching out our interpreter, and just as a matter of assuring that we have a clear record for both of our defendants, I'll swear in our new interpreter as well.

**ESPERANZA LOPEZ-DOMINGUEZ, INTERPRETER, SWORN**

THE INTERPRETER: I do, Your Honor.

THE COURT: Thank you.

With that, Mr. Goetz, whenever you're ready, please proceed.

MR. GOETZ: Thank you, Your Honor.

BY MR. GOETZ:

Q. Now, the incident I want to focus on -- and I understand there was the car chase and I'm not going to talk to you much about that.

But when I say "the incident," I'm talking about when Mr. Aljorna fell or slipped in front of his house, okay? That's what I'm going to focus on --

A. Yes, sir.

Q. -- and the events from there forward.

So my understanding is that that was about six

feet from the front steps of the residence, is that right?
A. There's -- the steps are kind of long. They're like three or so feet long, so six feet from the steps is my understanding, approximately ten or so feet from the actual, like, front, like the doorway.
Q. Okay. And as you've testified, there were multiple witnesses to that incident, the encounter between Mr. Aljorna and the ERO Number 1 besides ERO Number 1, correct?
A. Roughly five, I believe, that had some -- at least captured or witnessed it at some point.
Q. Okay. We'll talk about Mr. Aljorna -- and forgive me for butchering the names. Aljorna. He admitted he fled from a police officer in a motor vehicle, correct?
A. Yes, sir.
Q. He admitted grabbing a broom, correct?
A. Yes, sir.
Q. He admitted throwing that at ERO Number 1, correct?
A. In the general vicinity or back towards the officer as he's fleeing into the house is what he stated.
Q. But he denied ever striking ERO Number 1 with that, correct?
A. To my knowledge, yes.
Q. There were two other witnesses in the house, two females, correct?

A. Yes, sir.
Q. Both say they saw the struggle between Mr. Aljorna and ERO Number 1, correct?
A. The struggle or portions of it, yes.
Q. They were standing in that front doorway area they said about ten feet away.
A. I believe either in the doorway, like the front -- my understanding is as you go into this apartment there's like a kind of staircase. He goes into -- Unit 1 is the downstairs and then you go up the stairs to [redacted] where they resided, and they were kind of behind Mr. Sosa-Celis, who was in the doorway is my understanding.
Q. But then Mr. Sosa-Celis comes out when the officer claims he was being struck, right?
A. Yes.
Q. So those two witnesses neither corroborate ERO Number 1's claim that he was hit by a broom, correct?
A. Yes. Neither one stated that they weren't sure if any weapons were used, I believe, is my understanding.
Q. So neither corroborate the claim, correct?
A. Yes.
Q. And in fact, one of the witnesses testified that she did not see that, it did not happen. One said, "I'm not sure." The other one said, "No, he wasn't" --
A. No weapons were used and another one said she didn't see

any weapons, so it would corroborate the fact that no weapons were used.
Q. There was a male also in the house, correct, that was interviewed, correct?
A. He was in the downstairs apartment, Apartment 1, like a neighbor.
Q. I'll just say residence.
A. Yes, sir.
Q. It's a multi-unit. So he was in the building. He also said that he saw Mr. Aljorna being chased.
A. Yes.
Q. And he said he saw the struggle.
A. The initial struggle is my understanding, kind of like what happened when he fell and then the initial ERO officer engaging with him.
Q. And that witness also did not corroborate ERO Number 1's claim that he was struck by a broom or struck by a shovel.
A. I believe he said he didn't see any -- he wasn't able to observe that location at the time.
Q. So that's not corroborated.
A. No, it would not be corroborated, yes, sir.
Q. Okay. And you talked about City surveillance videos. I think it's called different things, but the Milestone system, you're familiar with that term?
A. I believe it was the Milestone system that was --

Q. And you reviewed that footage?
A. I did not review it.
Q. All right. But from the reports that you've read of those who have reviewed that footage, my understanding from your testimony is that it captures some of that struggle in front of the house?
A. I really haven't reviewed any reports. Or very generally in reference to it, I was given the information from agents that had reviewed it or through agents that had been told that at the time, because at the time this complaint was being completed, to my knowledge none of those reports were finalized.
Q. Okay. So --
THE COURT: Excuse me for one second. Sir, if you need to use your cell phone, please remove yourself from the courtroom to do so. Thank you.
BY MR. GOETZ:
Q. In the information that you've received about the review of that video surveillance footage, from what -- and as you've testified, it captures some of the struggle in front of that residence, the struggle that we're talking about.
Q. My understanding from the reviews, it appears to capture, like, the three individuals and what appears to be some type of altercation.
Q. And it also does not corroborate ERO Number 1's claims

that he was struck by any object, does it?
A. I'm not certain if you can see clearly enough and I have not done the review, but to my knowledge there was no specific sighting of any weapons used that was observed in the initial review of the video.
Q. So in the affidavit that your colleague S/A Schanz and you reviewed, it talks about the video captures three individuals in a physical altercation in the immediate vicinity of the subject residence.
A. Yes.
Q. And it talks about the camera focus and coverage changing, but it doesn't say anything about the video showing any individual striking that officer with any object.
A. No, it does not.
Q. I want to ask you a few specific questions in follow-up.
You began your testimony by talking about your current assignment, violent crimes. How long -- you said you're from -- you didn't say, but I gather you're from Georgia initially?
A. No, I'm from the state of Minnesota.
Q. Okay.
A. But it sounds like you worked in Georgia for awhile?
A. Yes, sir, I have.
Q. And then you came back. How long have you been with the

FBI?
A. I've been with the FBI for just shy of eight years, sir.
Q. And has that all been in Minnesota?
A. No, it has not.
Q. How long have you been detailed to Minnesota?
A. For approximately three and a half years.
Q. And how long have you been on your current assignment, violent crimes, dealing with assaults on federal officers?
A. I've been working on the Violent Crimes Squad for approximately ten months, and that includes what we consider AFO, or Assaults on Federal Officers, violations of 18:111.
Q. Has that become a more specific assignment in more recent times?
A. Yes, due to an unprecedented spike in assaults on federal law-enforcement officers, it is essentially the entirety of what I'm working right now.
Q. And is that unprecedented spike in connection with the unprecedented number of federal officers that are in Minnesota?
A. I believe you could interpret that, yes.
Q. I want to ask you -- you talked a little bit about physical evidence, photographs, things like that were taken at the scene. Was there any photographs documenting any blood trail?
A. I've only quickly reviewed some of them. I'm still

waiting on the 3D scan. To my knowledge, I have not seen any blood trail.
Q. Okay. So Mr. Sosa-Celis was shot, correct?
A. Yes.
Q. Was there any blood trail from -- so the altercation was about six feet from the steps. Was there any blood trail from that scene up until the doorway ten feet away?
A. To clarify, my understanding is that he's shot. I have not reviewed medical records confirming the gunshot, but that's what's been told to me, and it's assessed by him and his -- Mr. Aljorna.
I have not seen any blood trail to my knowledge at all on the scene. I just haven't seen any photographs or have not witnessed that. I also have not been told by any other officers that they observed any type of blood trail.
Q. In fact, witnesses report, other than ERO Number 1, that Mr. Sosa-Celis was actually shot when he was in the doorway of that house, right?
A. Approximately speaking, yes, sir.
Q. When he would have been about ten feet away from the officer.
A. Yes.
Q. To your knowledge, Special Agent, is there any physical evidence of a bullet strike or bullet hole in the doorway, that front doorway area of the building?

A. I've spoken with BCA agents and other FBI agents that were on scene specifically requesting that. To my knowledge, no bullet hole or assessed bullet damage to the residence has ever been noted. I am awaiting to see the 3D scan and believe that a location of the 3D scan may provide better insight.

I am aware that BCA did additionally attempt to run an explosive for gun K-9 in the vicinity to try to locate any shell casings and no shell casings have been recovered to date.

Q. And just a few final questions.

Did you personally interview ERO Number 1?

A. I did not.

Q. Was any BCA agent or state authority involved in interviewing ERO Number 1?

A. No.

MR. GOETZ: That's all the questions I have. Thank you.

THE WITNESS: Yes, sir.

THE COURT: Thank you, Mr. Goetz.

Ms. Wolpert?

MS. WOLPERT: Your Honor, may I have just a few minutes to speak to my client? Maybe one minute. I just have a few questions.

THE COURT: Okay. Well, why don't you take the

time you need. Let's have a recess for just five minutes here.

(Recess taken at 10:00 a.m.)

* * * *

(10:05 a.m.)

IN OPEN COURT

THE COURT: All right. Ms. Wolpert, I think we left off with it being your turn for cross-examination, so whenever you're ready.

MS. WOLPERT: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MS. WOLPERT:

Q. Special Agent Getsch, my first question for you concerns the time period where there are three people within six feet of the residence, ERO Number 1, and then the two co-defendants here today.

A. Yes, ma'am.

Q. Okay. And you testified today that when ERO Number 1 got to the home, within six feet of the home, that ERO Number 1 saw Mr. Sosa-Celis in the doorway.

A. Yes, he believed -- it's corroboration of what he observed, an individual in the doorway with a shovel and then based off of Mr. Sosa-Celis's statements to reassess that individual as Mr. Sosa-Celis.

Q. So your testimony here today is that it was Mr. Sosa-Celis standing in the doorway with a shovel.
A. Yes, that is my understanding.
Q. Okay. However, you helped write the affidavit in support of the criminal complaint, correct?
A. Yes, ma'am.
Q. And on page 4 of that criminal complaint it says on page 5: "ERO Number 1 then saw who he believed was a third Hispanic male approach with a snow shovel," is that correct?
A. Yes. That would be a later -- that's not the initial identification of the individual standing. That's the second one is my understanding.
Q. So your testimony is that there were two people who had snow shovels in the doorway when ERO Number 1 arrived close to the residence?
A. My understanding of the information from the officer and what was put in the affidavit is that the officer believed that there was actually three people that he was fighting with at the time.
Q. He believed he was fighting with three people, but I want to go back to Mr. Sosa-Celis, because you testified today that when ERO Number 1 arrived, Mr. Sosa-Celis was in the doorway, correct, you testified to that?
A. Yes.
Q. But you did not testify that Mr. Sosa-Celis was holding

onto a shovel, is that correct?
A. No. Mr. Sosa-Celis told me -- and I testified earlier -- that he admitted to holding onto the shovel.
Q. But you also have on page 5 of your report there was a third Hispanic male holding a shovel.
A. Yes, that's from the officer's statements, yes.
Q. So there were two other people other than ERO Number 1 and Mr. Aljorna who were holding shovels; is that your testimony?
A. The observation of the ERO officer is believed there was three individuals. At no other indications have I identified a third individual to be involved.
Q. Now, later this morning you testified that the individual with the snow shovel was not Mr. Sosa-Celis, is that correct?
A. I'm confused at what you're asking. I'm sorry.
Q. That confusion is precisely what I'm trying to clarify, because your testimony was that Mr. Sosa-Celis was standing on the doorstep with a shovel, that there was a third Hispanic man also there with a snow shovel, correct?
A. In the ERO officer's understanding, yes. He believed that he saw a third individual that had a snow shovel that I believe came up and hit him.
Q. But you also testified this morning that the person who struck ERO Number 1 with a broom was Mr. Aljorna, correct?

A. Yes, I believe that's correct, yes.
Q. And your testimony was not that Mr. Sosa-Celis attacked ERO Number 1 with a broom, correct?
A. No. To my specific knowledge -- no.
Q. No --
A. No -- I don't believe I've testified that Mr. Sosa-Celis used a broom. Is that what your question was?
Q. Earlier you testified that the person who struck ERO Number 1 with a broom was Mr. Aljorna, correct?
A. Yes.
Q. Now, in your affidavit on page 5 again, you state: "Mr. Sosa-Celis passed the broom to Aljorna and Aljorna then attempted to hit ERO Number 1," is that correct?
A. From the ERO officer's statements and from other the other agent's affidavit, yes, that is correct.
Q. Okay. So it was not Mr. Sosa-Celis who was hitting ERO Number 1 with a broom.
A. At that time, the statement that you're referencing is correct. It would be Mr. Aljorna.
Q. Now, you stated it was dark?
A. Yes.
Q. The agent, ERO Number 1, did not know who was hitting him with the broom? Yes?
A. I believe the initial hits that he received, I'm not certain and I would have to review the 302 of that

interview, whether he knew exactly who was hitting him that -- the initial hits of the broom. There were multiple hits with the broom initially, then a shovel, and then additional hits with the broom.
Q. But as you sit here today, you can't say for sure that Mr. Sosa-Celis was hitting ERO Number 1 with a broom.
A. No, I'm not stating that specifically. Mr. Aljorna, yes, Mr. Sosa-Celis, no.
Q. Now, earlier during questions by Mr. Goetz you were asked about that moment when there was a discharge of a firearm.
A. Yes, ma'am.
Q. And at that moment it's true that ERO Number 1 was about six feet away from the entrance to the house, correct?
A. Rough assessment, yes. The initial contact was assessed to be about ten feet from the house, six feet from the doorstep. I'm not sure with the rolling around the exact location of where it finished at. It could have been closer, could have been further.
Q. And the discharge occurred when Mr. Aljorna and Mr. Sosa-Celis were in the doorway of the house, correct?
A. My best understanding in re-creating the scene is in the doorway or vicinity of the doorway.
Q. Okay. And in fact, witnesses testified that the gunshot may have gone through the door, yes?

A. That's my understanding, yes.
Q. It's also possible that it went through the doorway as the door was being closed, yes?
A. Yes, or could have struck the doorjamb and deflected for all I know.
Q. And the door was being closed with the two co-defendants, Mr. Sosa-Celis and Mr. Aljorna, inside the hG49ouse, correct?
A. Yes.
Q. And that's when the discharge occurred.
A. Yes. Right about that time is from their statements.
Q. Now, it's true that you brought in what you called an Evidence Response Team which included agents from ERO, DHS, the FBI, BCA, correct?
A. Yes, ma'am.
Q. And according to the affidavit, the broom was never secured, correct?
A. To my knowledge, no broom has been secured. There's two, to be clear.
Q. Say that again?
A. There's two brooms that were observed on the scene and neither of them have been secured.
Q. And neither of the brooms were recovered, correct?
A. To my knowledge, neither.
Q. Only the shovel was collected by law enforcement as

evidence, is that right?
A. Yes. BCA has it.
Q. And your affidavit also states with respect to the broom or brooms that ERO Number 1 saw Mr. Sosa-Celis pass the broom to Mr. Aljorna, correct?
A. I believe that is the recollection that he had.
Q. And then it was Mr. Aljorna who attempted to hit ERO Number 1.
A. After Mr. Aljorna essentially stood up and got away from his grasp, what was given to use from the ERO officer is that he observed Mr. Sosa-Celis hand Mr. Aljorna a broom.
Q. And that's on page 5 of your affidavit, correct?
A. Yes. And to be clear, the ERO officer didn't know the identities or names of the individuals. We're reconstructing this from what he's observing and what they provided in statements as their general location.
Q. Now, ERO Number 1 discharged his firearm and hit my client, Mr. Sosa-Celis, is that correct?
A. We assess that to be true, yes.
Q. And in fact, when you conducted an interview of Mr. Sosa-Celis in the hospital, medical staff were actually taking out and removing shrapnel from his leg as he was speaking to you, is that right?
A. No.
Q. No.

A. No, not at all.
Q. So is it your testimony that the FBI does not have any custody of any shrapnel recovered from the body of Mr. Sosa-Celis at the hospital?
A. No. I was contacted after I interviewed him at the time that I was interviewing him aside from just adjusting some of his bandages or IVs. I don't believe he received any treatment. The nurse was sitting in there the entire time. She's documented and will be documented in our FBI reports.
He was talking to us, interacting with us. After I left I was notified that they believed there was parts of a bullet that were being extracted from him during additional treatment, and our ERT team went back to the hospital and secured it from other law enforcement that was on scene.
Q. Okay. So your answer is yes, you did recover --
A. Yes, we did. We did recover what is assessed. I have not seen it, but I believe it's going to be bullet fragments or some type of shrapnel that was in his body.
Q. Have you done any testing of the shovel to determine whether Mr. Sosa-Celis ever handled it, used it in any way during this incident?
A. I'm not sure if -- BCA, again, has that shovel. To my knowledge, no testing has been conducted or reports have been given to me.

Q. Now, it's true you interviewed some neighbors and also two women who were residing in the same residence that's at issue in this case, is that correct?
A. Yes, ma'am.
Q. And they both recall that Mr. Sosa-Celis was physically separating or pulling, okay --
A. Yes.
Q. -- Mr. Aljorna, correct?
A. Yes.
Q. And they did not testify that Mr. Sosa-Celis was in any way attacking ERO Number 1, correct?
A. They never testified, but in their statement to us they did not have any information that either one said -- no, to my knowledge there was no direct witnesses of -- they knew the physical, like, altercation, but as far as the striking of the broom and the shovel specifically, but to my knowledge there was no information provided from them that they observed that.
Q. But in fact, other than ERO Number 1, you don't have a statement from any witness that it was Mr. Sosa-Celis who was physically attacking or even in contact with ERO Number 1, is that correct?
A. He admitted to --
Q. Wait. I just need a yes or no.
A. Can you please rephrase the question one more time?

MS. WOLPERT: Can you just read back the question, please?
(Question read back by the court reporter)
A. Generally, yes.
Q. Let's talk about Mr. Sosa-Celis. It's true that he has no history of any crime of violence, isn't that right?
A. I'm not aware of any off the top of my head. From the records I reviewed and what I can recall, I'm not aware of any.
Q. And you ran Mr. Sosa-Celis' criminal history, yes?
A. I did not. Somebody else did and it was provided to the United States Attorney's Office for pretrial.
Q. You don't know --
A. Very quickly reviewed it. I have not reviewed the entirety or confirmed if it was the entirety of his criminal history.
Q. Okay. So you have no evidence today for this Court that Mr. Sosa-Celis has a history of any crime of violence, correct?
A. No, I would not testify that I have any knowledge of that, no.
Q. And you have no information to share with the Court as to whether Mr. Sosa-Celis has any history of failing to show up to court?
A. One of the individuals has a history of false

information to law enforcement. I don't know the totality of that. Again, I have not in detail reviewed the criminal history, so no, I would not be able to testify to that.
Q. But you said one individual, but you're not referring to Mr. Sosa-Celis, are you?
A. Specifically, no. Again, I would not testify that I have any knowledge to the question that you're asking, no.
Q. So you just mentioned something about false information to law enforcement, is that right?
A. Yes.
Q. Let's talk about ERO Number 1. How long has he been working in his position -- how long has he been working in his position as an Enforcement of Removal Operations agent?
A. I don't believe I've been provided that information.
Q. Okay. What kind of training has ERO Number 1 had in terms of interacting with detainees or suspects who they seek to arrest or detain?
A. Again, he's not a part of my agency. I have not reviewed his training records. I don't even believe there's been specific discussions in reference to that, so I don't know.
Q. Can you speak to any experience ERO Number 1 has in terms of his experience with serving as a law enforcement officer in any capacity?
A. I'm sorry. I cannot.

Q. Can you tell me, please, what directives ERO Number 1 was given in terms of his enforcement operations in Minneapolis on January 14, 2026?
A. No.
Q. And does ERO Number 1 have any training in the use of deadly force?
A. I believe he would have to in order to serve in his capacity, but again --
Q. You believe he would have to, but you don't know.
A. It's a standard of any law enforcement, federal or state, but I have not reviewed his training and I'm not privy to exactly what training he specifically received.
Q. Your affidavit states that ERO Number 1 is not from Minnesota. Where is he from?
A. I'm not sure of the exact location, but I believe it's somewhere near the southern border in Texas.
Q. How old is ERO Number 1?
A. I couldn't tell you.
Q. Has ERO Number 1 ever had experience -- had any experience in discharge of a firearm?
A. Again, it's a standard. If he's authorized to carry, the agency would give him training, but I have not reviewed his records and I do not know what training he's had.
Q. When you met with Mr. Sosa-Celis at the hospital, he was cooperative, yes?

A. Yes.
Q. In fact, when you arrested him he had his hands up in the air and was on his knees when he was arrested, correct?
A. I did not arrest him. I don't have direct statements of exactly what he was doing at the time that he was detained inside of his house.
Q. Okay. But you have no evidence that he was resisting arrest inside the house or caused any danger to anyone inside the house, correct?
A. That is incorrect.
Q. And when you or another agent spoke with Mr. Sosa-Celis at the hospital he was cooperative, yes?
A. Yes.
Q. He provided answers to your questions?
A. Yes.
Q. You secured his cell phone and he voluntarily gave you the password to his cell phone, correct?
A. Yes.
MS. WOLPERT: I have no further questions, Your Honor.
THE COURT: Thank you, Ms. Wolpert.
Mr. Kanassatega, it's obviously the Government's prerogative to conduct any redirect examination that you see fit. We've been going for awhile and I feel like I've heard what I need from this witness as it relates to probable

cause, but that doesn't mean that what I say goes here.

MR. KANASSATEGA: No further questions, Your Honor.

THE COURT: Thank you. With that, Agent Getsch, you can be excused. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Mr. Kanassatega, any other witnesses for the Government as it relates to probable cause?

MR. KANASSATEGA: No, Your Honor.

THE COURT: Any other exhibits?

MR. KANASSATEGA: No, Your Honor.

THE COURT: All right. That will be submitted from the Government's standpoint as it relates to probable cause.

Mr. Goetz, any witnesses or exhibits on the issue of probable cause on behalf of Mr. Aljorna?

MR. GOETZ: No, Your Honor.

THE COURT: All right. Ms. Wolpert, how about on behalf of Mr. Sosa-Celis?

MS. WOLPERT: No, Your Honor.

THE COURT: All right. Then we will consider the matter fully submitted as it relates to probable cause. I'm happy to hear brief argument from the parties on the issue of probable cause starting with the Government if you see fit. I could also take it submitted on the record.

MR. KANASSATEGA: As submitted on the record, Your Honor.

THE COURT: Thank you, Mr. Kanassatega.

Mr. Goetz?

MR. GOETZ: Your Honor, if the Court would allow just briefly.

Mr. Aljorna is charged by complaint with assaulting an officer. The offense is defined as forcibly assaults, resists, opposes, impedes, intimidates or interferes with any person designated under 18 USC Section 114. We concede that ERO Number 1 is so designated. We do not concede that there's probable cause to force being used or the assault, but it's the forcibly element that I think is -- probable cause is lacking.

I'm certainly familiar with the level of that burden of proof, which is low, and I don't often argue these motions, but I think this is a case that warrants an argument and careful consideration.

The evidence here of use of force comes solely from ERO Number 1. That is that there was a tussle, an argument, but in terms of any kind of physical use of the objects, the broom, the shovel, that's completely based upon ERO Number 1's claim. There's really no corroboration. They were present, those objects were present, but they were never used forcibly to strike that officer. We don't have

any witnesses corroborating that, nobody in the house or anybody else in the surrounding area. There was no information given that any witness corroborated ERO Number 1's claim.

Also importantly, Your Honor, the video evidence does not corroborate that claim. If we had an officer who was being physically assaulted with a broom and a shovel, hit after hit after hit, you would have been able to see some of that. There would have been some corroboration on the video, but we haven't heard any evidence of that.

Now, I know the Court has not seen the video itself and I know we're talking about probable cause, but I think it is important to consider -- there's a few cases that are on point, ***Scott vs. Harris*** -- or I think they're instructive. They're not directly on point, but they're instructive. ***Scott vs. Harris***, 550 U.S. 372, at 378 -- it's a U.S. Supreme Court decision from 2007 -- and ***Bernini vs. City of St. Paul*** -- it's an Eighth Circuit case -- 665 F.3d 997 from 2012 at 10031004.

But those stand for the proposition, Your Honor, that when the Court is considering -- these were civil cases dealing with summary judgment, but the similarity of the standards is that the evidence is viewed in the light most favorable to the opposing party. That's the standard here. The Court will and should view the evidence in a light most

favorable to the Government, except when there's video evidence that clearly contradicts that view. Now, the Court has not seen the video evidence, so it's a little different, but from the description of the video evidence in the case there's nothing that confirms ERO Number 1's claim of the use of force.

THE COURT: Well, I'm not sure I'm with you on that analysis, because you're right. At least as I remember, ***Scott*** and ***Bernini*** were both civil rights cases and the plaintiffs there were appealing the grant of summary judgment to the officers. And in those decisions the court -- both courts found, the Supreme Court and the Eighth Circuit, I think, found that where the video evidence directly contradicted statements that were made by the plaintiffs, that the court on summary judgment was free to consider and should consider the contradictory video evidence. So we're already talking about a civil rights case versus probable cause, we're already talking about summary judgment versus a different standard. And maybe most importantly, the video was before the court. And here there's not a conflict of evidence. I have evidence and I don't have contradictory evidence.

So I appreciate the analogy, but I think it stretches a little far.

MR. GOETZ: And I understand, Your Honor. I think

the point is that we don't have any video evidence corroborative of the officer's version of events. And even at the low probable cause standard when we have that conflict, the Court can rely on the description in the video evidence, which does not support any use of force by Mr. Aljorna.

Also -- and the Court is not considering credibility. You don't make those calls here. I understand that, but I think when we're looking at the totality of the evidence there certainly would be a motive on ERO Number 1's part to falsely claim that there was this force used against him because of the use of force that he had. And if he shot Aljorna and Sosa-Celis from ten feet away when they were fleeing and he was not in any immediate danger of death or great bodily harm, that is unreasonable, it's unlawful, and he could be accountable. So there is that certainly motive.

That's all I have, Your Honor, but I think it is one of those rare cases where probable cause is not present.

THE COURT: Thank you, Mr. Goetz.

Ms. Wolpert, I see you standing up. It looks like you have something to say on probable cause. Come on up.

MS. WOLPERT: Thank you, Your Honor, and I'll be brief.

I'll just incorporate by reference the arguments that were just made by Mr. Goetz and I won't repeat them.

However, there's a few things that require emphasis regarding the facts and circumstances of this case for probable cause.

The officer who testified on behalf of the Government today acknowledged that he had no evidence of physical contact, let alone striking of the officer, of ERO Number 1, by my client Mr. Sosa-Celis other than the statement of ERO Number 1 and for the reasons that Mr. Goetz was just articulating.

There's reason to, you know, why ERO Number 1 might have made the statements. He had a motive to make certain statements to justify the discharge of the firearm.

The other thing is, with respect to Mr. Sosa-Celis, is that the evidence -- and you heard this with the agent's testimony. It was confusing. There's discrepancies between what was testified to today versus what's in the affidavit regarding the role of my client, Mr. Sosa-Celis, who was at the beginning an observer and then shouting encouragement to his co-defendant sitting here today, and then trying to help him and physically separate the agent from Mr. Aljorna, and that's what the witnesses said other than ERO Number 1.

And so to me the elements of this offense, was there physical contact, okay, no. Was there efforts by Mr. Sosa-Celis to actually de-escalate and try to separate ERO

Number 1 from Mr. Aljorna? Yes. So I think there's reasonable doubt here as to whether Mr. Sosa-Celis was engaged in any physical contact, any threats, any forcibly assaulting ERO Number 1, and I think the testimony showed that today.

So for all these reasons, yes, it's rare, but we believe that there is no probable cause to support the criminal complaint.

THE COURT: Thank you, Ms. Wolpert.

Okay. I'll tell you my thought on probable cause, tell you why briefly, and then we'll turn to the next issues in the case. I do think that the testimony I heard here today does establish probable cause for violations of 18 U.S.C. Sections 2 and 111(a)(1).

I heard testimony from Special Agent Getsch that established at least for the purposes of probable cause that there was a scuffle, that as a part of the scuffle based on statements from ERO Number 1 and corroborated by each of the defendants that Mr. Aljorna at some point had a broomstick and Mr. Sosa-Celis at some point had a snow shovel. There's also credible testimony of a gash in the hand of ERO Number 1 consistent with getting hit with a broomstick, essentially a defensive wound, and also testimony about getting hit with a snow shovel. That's corroborated inferentially by the fact that both of the defendants were then found in the

house immediately after the assault, and there's no suggestion that there were others in the house who may have committed the assault.

That isn't to say that there's not another way to see the evidence or that there might be issues with the evidence, but my job at a preliminary hearing is to determine whether there's a low level of proof, probable cause, and I think it sufficient, particularly for the aid-and-abet charge as well.

So, knowing that, let's turn to the issue of detention or release.

Mr. Kanassatega, I have two recommendations from Pretrial Services, one for each defendant, recommending release on conditions here, but what is the Government's position as it relates to detention or release for these two gentlemen?

MR. KANASSATEGA: Your Honor, the Government persists in detention.

THE COURT: Okay. I'll hear from you on your argument as you see fit. And I think the way we'll do it is, Mr. Kanassatega, I'll just ask you to argue on both of them at the same time and then I will have Mr. Goetz and ms. Wolpert tell me what they need to tell me on each of their clients.

MR. KANASSATEGA: Thank you, Your Honor, and, Your

Honor, the Government will be very brief in this.

And yes, understanding that Pretrial Services is recommending release on conditions as to both of the defendants before us today, the Government will ask that the Court not place too much emphasis on that recommendation, because the Bail Reform Act precludes Probation from considering the underlying facts of this case, yet the Government believes that the underlying facts of this case do support detention and the Government -- there is no condition or combination of conditions that will reasonably assure either of their appearances at future proceedings and the safety of any other person or the community.

And the Government will be arguing as to -- or the Government will ask the Court to highlight the nature and circumstances of the offense charged, the history and circumstances, just to flag for the Court the history and circumstances of Mr. Sosa-Celis. I'll come back to that in a moment.

As to the nature and circumstances of the offense charged, Mr. Aljorna fled from a traffic stop and led law enforcement officers on a high-speed chase that reached 80 miles per hour as testified, and lasted --

THE COURT: Is there a fair implication from that that officers then pursued at 80 miles an hour?

MR. KANASSATEGA: Unclear, Your Honor -- well,

Your Honor, I will backtrack and just simply state the -- or argue that, as testified, the flight lasted from anywhere from 15 minutes to 20 minutes as stated in the affidavit and up to 30 minutes as -- or longer -- as provided in the defendant's statement. And when that flight ended Mr. Aljorna continued to flee on foot, and that is an evasion of law enforcement and Mr. Sosa-Celis aided Mr. Aljorna by telling -- encouraging him to keep running and by providing Mr. Aljorna with the broom to strike ERO Number 1, which caused the gash.

This pursuit and evasion supports that there is no condition or combination of conditions that they will reasonably appear at future proceedings, and that is also in tandem with the -- I will also draw the Court's attention to Mr. Sosa-Celis's pending case in Hennepin County from April 2025 in which he did provide a peace officer a false name, also an act of evasion.

And, Your Honor, for those reasons the Government does not believe that there is a condition or combination of conditions that will reasonably assure their appearance at future proceedings or the safety of any other person or the community.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Kanassatega. Appreciate it.

All right. Mr. Goetz, do you want to start off with Mr. Aljorna?

MR. GOETZ: Yes, Your Honor. Thank you.

Obviously the defense sees things differently and we do request that Mr. Aljorna be released on the conditions proposed by Pretrial Services.

THE COURT: Well, let me kind of cut to the quick on that. You know, I didn't hear much from the Government and neither did you about Mr. Aljorna's kind of broad personal history and characteristics. The focus is on really offense conduct and I know that the law suggests that that's one of the less important circumstances for me at a detention hearing, because matters have not been proven beyond a reasonable doubt, but I also can't ignore it, and my concern is about the flight, both the fleeing in a vehicle and then fleeing on foot.

How do I marry that with my job to make sure that I can come up with conditions that would mitigate a risk to both community safety and risk of flight?

MR. GOETZ: I think you have to look at this incident in the context of his life as we have it. And as a proffer for the Court, I would tell you that he's 26 years old. He's a high school graduate. He completed high school in Venezuela.

The Government refers to one of the females as his

girlfriend. I represent to the Court it's his wife, or he views her as his wife, so it's a committed relationship. She was present at the house. She was there. He has a one and a half year old son as well, so has these ties to the community.

If we're looking at flight or risk of flight, let's look at what his history is, and we don't have anything that would suggest a risk of flight. He has had a traffic matter in Dakota County, no indication he failed to appear at all on that matter. That was the case in the March 6, 2025 case and that was also when he had another matter on March 23 of 2025. On both those cases based upon the report from Pretrial Services he fulfilled his obligations to the court. And I think that's the standard here, Your Honor, is there a risk of nonappearance. That's the standard. So even though this offense may involve flight --

THE COURT: Right. And I don't mean to cut you off, but the Bail Reform Act speaks to risk of nonappearance. I'm really thinking about the risk of flight as a community safety issue.

MR. GOETZ: And again, Your Honor, I would look at his entire life. And other than the allegations of this incident -- and, you know, we have 15 minutes of conduct. And that is -- I'm not saying it's not serious, it is, but

it's a one-off incident. We don't have any indication he has done that at any time in his life.

So the question under 18 U.S.C. Section 3142, then, of course, is there a condition or combination of conditions that can reasonably assure -- or rather I would put it the other way. Can the Government prove by clear and convincing evidence that there's no combination of conditions that would reasonably assure that the community would be safe. And when he has not put the community at risk other than those 15 minutes of his life, when there's not any evidence he's ever put the community at risk, I think these conditions are more than sufficient.

If the Court has any concern about the structure or the significance of that, I don't see a halfway house as being a requirement here. But if he's at a halfway house subject to GPS monitoring, that would be more restrictive on his movements, if you will.

The Bail Reform Act -- this is, as I said, not a presumptive detention case -- the Bail Reform Act clearly favors release over detention. Detention only applies to a small fraction of the cases and this is simply not one of those cases, Your Honor. The conduct alleged, notwithstanding, that warrants detention. The Court has seen many, many serious cases in its time. Detention is warranted in many of those cases. This is not one of them.

THE COURT: Thank you, Mr. Goetz.

Ms. Wolpert?

MS. WOLPERT: Your Honor, Mr. Sosa-Celis also requests that you follow the recommendations of Pretrial Services, because there is a combination of conditions that could assure that Mr. Sosa-Celis will in fact appear for these proceedings.

A few things that are in the bond report and a few things that are not in the bond report.

Mr. Sosa-Celis has been in Minnesota and has been living here for several years. He has a one-year-old son and that was addressed in part by the Special Agent's testimony today. His son was born here.

Mr. Sosa-Celis is committed to his son, he's committed to his ex-wife, who also lives here, and has been working at Door Dash and other sorts of jobs like that in order to raise money so that his ex-wife doesn't have to work, that she can stay home and take care of his son.

He cares deeply about his family and everything that's important to him is here in Minnesota, here in Minneapolis.

In terms of his risk of flight, again, there's nothing in the record from Pretrial Services indicating that he has not fulfilled his obligations to attend various court proceedings. The record indicates from Pretrial Services

that he has five traffic offenses and there's no indication that he has not appeared for those. And then the pending matter in Hennepin County, again, no indication that he hasn't appeared.

He does treat these proceedings extremely seriously because he wants to stay and his life is here. His prior offenses are not violent until this instant offense. There's nothing in his record to even indicate that he was capable of being in such circumstances. But given the record, there is a set of conditions that we think would reasonably assure that he would appear.

And in terms of dangerousness, again, there's no violent offenses in his record and he was basically in a situation trying to help his cousin, and in the context of what's happening in Minneapolis today, his care and concern for his family and his cousin are really what drives this situation today.

So we do suggest that there are conditions that would warrant his is release.

THE COURT: All right. Thank you, Ms. Wolpert.

(Pause)

THE COURT: Okay. Well, certainly the lawyers know this, but for the benefit of the Court and for you, Mr. Aljorna, and you, Mr. Sosa-Celis, let me just explain to you how I decide issues on detention. I don't just decide

with my head and my heart. I'm guided by what's called the Bail Reform Act that requires that I consider certain things like the nature and circumstances of the alleged offense, each of your individual, personal characteristics, any danger to the community if you'd be let out, and the weight of the evidence.

I have considered all of those matters. I heard testimony today and I heard proffers today, and based on what I've heard and my review, I do believe there are conditions that would support each of your release. I want to go through some of those conditions with you and then I want to make sure that your lawyers have enough time to go through all of those conditions with you.

The conditions are a little different for each of you and I also want to explain why I'm making this decision.

The offense conduct, I have to credit -- I don't have to, but I have credited the testimony that I heard here today and I found probable cause to believe the offense conduct occurred. It's serious conduct. There might be a different part of the story, but it's serious offense conduct when there's allegations of assault on a federal officer that was preceded by flight in a car and then on foot. That's serious offense conduct. I've balanced that against the fact that there's very little criminal history for each of you, you have strong community ties, and it

appears to be kind of what I would call aberrant behavior.

I also think that even considering the risk to community safety, there are conditions I can come up with for each of you and I'm going to start with you, Mr. Aljorna, because I'm going to impose the conditions that Pretrial Services had recommended, but I'm also going to highlight a couple of additional conditions that I'm going to impose, okay? And I'm not going to go through all of them, because Mr. Goetz can certainly do that. I want to highlight the additional conditions I'm imposing.

Number one, I'm imposing a condition -- and the parties will see this at paragraph 7(g) -- that you avoid all contact, directly or indirectly, with any person who is or may be a victim or a witness in the investigation or prosecution, including specifically those involved in immigration enforcement.

I also have credited what Mr. Kanassatega said to me about the risks involved in the flight of Mr. Aljorna, and because of that I'm going to add a condition that you subject yourself to GPS monitoring, an ankle bracelet, and that will be monitored by Probation and Pretrial Services, and you will be on home detention. Home detention means that you're essentially on house arrest except for very limited circumstances that your probation officer would in advance approve for you.

Now, I'm also going to put a little caveat on that for you, which is that GPS monitoring is only to be submitted within 72 hours of release, your release, from ICE custody if you're released within the District of Minnesota. In other words, if for some reason or another you're no longer in Minnesota, they don't have to worry about that condition and neither do you.

I'm also going to impose a condition that any employment, if you are released in the District of Minnesota, be limited to positions approved in advance by U.S. Probation and Pretrial Services. That's because this offense conduct was alleged to have occurred while you were in the middle of delivering for Door Dash and I don't want a recurrence of that.

Beyond that, the other conditions are similar to what are the standard conditions and those that were already recommended by Probation and Pretrial Services, knowing that it was the Government's intent to seek detention and that I'm releasing.

Are there any additional conditions the Government wants to be heard on?

MR. KANASSATEGA: No, Your Honor. Thank you.

THE COURT: Mr. Goetz?

MR. GOETZ: No, Your Honor.

THE COURT: Okay. Mr. Goetz, then I'm going to

pass over to you a copy of the appearance bond that I've pre-signed here, which is just Mr. Aljorna has promised to come to court, as well as the conditions.

(Documents handed to Mr. Goetz)

THE COURT: All right. Mr. Sosa-Celis, as I said, I'm releasing you as well. Your conditions are going to be slightly different from those that were recommended by Pretrial Services too, but they're also going to be a little different from Mr. Aljorna's, so I want to highlight the areas where they're different.

For you too, I am going to impose a condition that you avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including those involved in immigration enforcement.

I'm not imposing a GPS bracelet for you or a home detention condition. I don't think that those are appropriate for you. And that is the only change that I've made from those that were recommended from Probation and Pretrial Services.

Ms. Wolpert can take as much time as she needs to go through all of the conditions with you, but before I let her do that, let me turn first to Mr. Kanassatega and see if the Government wants to be heard on any additional conditions.

MR. KANASSATEGA: No, Your Honor.

THE COURT: All right.

Ms. Wolpert, would you approach so I can give you a copy of these?

MS. WOLPERT: Thank you, Your Honor.

You mentioned that he couldn't interact with any victim or witness, but the people in the house when he was arrested include his son, also includes his girlfriend. Is that kind of contact permissible?

THE COURT: From the Court's perspective, yes. If there's any question from Pretrial Services as we go forward on that, just bring it to me, but obviously to the extent -- so long as there's no discussion about the circumstances giving rise to the offense.

So understand that, Mr. Sosa-Celis. You don't have to live in a different place. You can talk to your family that are witnesses, but don't talk to them about what happened, okay? That's a court order.

DEFENDANT SOSA-CELIS: Yes, sir.

THE COURT: Now, there's one additional thing that I want to talk to each of our defendants about that is very important for them to know.

The authority I have is to detain or release from federal criminal custody. I have no authority over any immigration detention. And I understand there may be

immigration detainers for each of you. So the release that I have ordered today is simply release from federal criminal custody. It doesn't mean that you're going home necessarily today, okay?

I think that covers the business we had for the Court for each of these defendants, but Mr. Kanassatega, I might be wrong. Anything further?

MR. KANASSATEGA: Your Honor, only one thing. The Government would request that Your Honor stay implementation of your order to allow the Government time to appeal the decision to the district judge.

THE COURT: What's the authority for the stay? And the only reason I ask, Mr. Kanassatega -- it's not a law school exam or anything, but my understanding is both of these defendants have immigration detainers, so I'm not sure that a stay is necessary because if they're going anywhere, it would be out of the country, in which case the conditions didn't matter in the first place.

MR. KANASSATEGA: Your Honor, only that the Government has an interest in seeing this prosecution through.

THE COURT: Understood. Let me do this. Let me give you a stay until tomorrow at noon.

MR. KANASSATEGA: Thank you, Your Honor.

THE COURT: All right. Mr. Goetz, anything else

on behalf of Mr. Aljorna?

MR. GOETZ: No, Your Honor.

THE COURT: All right. Ms. Wolpert, how about on behalf of Mr. Sosa-Celis?

MS. WOLPERT: Nothing, Your Honor.

THE COURT: Okay. Thank you. We're in recess.

(Proceedings concluded at 11:00 a.m.)

* * * *

# C E R T I F I C A T E

I, **TIMOTHY J. WILLETTE**, Official Court Reporter for the United States District Court, do hereby certify that the foregoing pages are a true and accurate copy of the transcript originally filed on **January 28, 2026**, incorporating redactions requested by **Attorney Robin M. Wolpert**. Redactions appear as "[redacted]" in the transcript.

**Certified by:**

***/s/ Timothy J. Willette***

TIMOTHY J. WILLETTE, RDR, CRR, CRC
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota 55101
651.848.1224