UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, Plaintiff, | ) | File No. 26-mj-23 (PAM-DLM) |
| vs. | ) | St. Paul, Minnesota February 3, 2026 11:03 a.m. |
| Alfredo Alejandro Aljorna (1), Julio Cesar Sosa-Celis (2), Defendants. | ) | |

---

BEFORE THE HONORABLE PAUL A. MAGNUSON
UNITED STATES DISTRICT COURT JUDGE
**(MOTION HEARING)**

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | U.S. Attorney's Office<br>SYNGEN KANASSATEGA, AUSA<br>600 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, Minnesota 55415 |
| For the Defendant Alfredo Alejandro Aljorna: | Goetz & Eckland<br>FREDERICK J. GOETZ, ESQ.<br>Suite 425<br>615 1st Avenue NE<br>Minneapolis, Minnesota 55413 |
| For the Defendant Julio Cesar Sosa-Celis: | Sapientia Law Group PLLC<br>ROBIN M. WOLPERT, ESQ.<br>120 South 6th Street<br>Minneapolis, Minnesota 55402 |
| Court Reporter: | ERIN D. DROST, RMR-CRR<br>Suite 146<br>316 North Robert Street<br>St. Paul, Minnesota 55101 |
| Interpreter: | Esperanza Lopez-Dominguez |

Proceedings recorded by mechanical stenography; transcript produced by computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendant present)

THE COURT: Good morning, everyone.

MR. GOETZ: Good morning, Your Honor.

THE COURT: We have the matter of the United States v. Aljorna and Sosa-Celis.

And with that, may we have the interpreter sworn.

(Interpreter Sworn)

THE COURT: Thank you.

And, Counsel, if you would be kind enough to note your appearances, please.

MR. KANASSATEGA: Good morning, Your Honor.

THE COURT: Good morning.

MR. KANASSATEGA: Syngen Kanassatega on behalf of the United States.

MR. GOETZ: Good morning, Your Honor. Fred Goetz, G-o-e-t-z, by appointment on behalf of Alfredo Aljorna.

THE COURT: I hope you didn't speed coming back from Rochester this morning.

MR. GOETZ: I appreciate the Court's rescheduling this. Smooth sailing this morning.

THE COURT: That's right. We did change it. Okay. Thank you.

MS. WOLPERT: Good morning, Your Honor. Robin Wolpert on behalf of Mr. Sosa-Celis who is seated to my right. And also in the courtroom is his girlfriend who was recently released after obtaining a writ of habeas corpus.

THE COURT: Thank you.

Okay. With that, we have an appeal of Judge Micko's order of release and an appeal by the Government.

And if you would proceed, please.

MR. KANASSATEGA: Thank you, Your Honor.

THE COURT: You know, Counsel, as you start, maybe I should ask all counsel, does anybody anticipate the taking of live testimony today?

MR. KANASSATEGA: No, Your Honor.

MR. GOETZ: Defense is in agreement, Your Honor.

THE COURT: I'm sorry. I didn't hear you, Mr. Goetz.

MR. GOETZ: Yes, Mr. Aljorna agrees with that. We're relying on the record --

THE COURT: Okay. Okay. I didn't know what the "agrees" was. Thank you.

MS. WOLPERT: Agree, Your Honor.

THE COURT: Okay. Very well. Proceed. We're set to go then.

MR. KANASSATEGA: Thank you, Your Honor. The Government will be brief in its argument, and the argument

is simple. The Government is relying on two factors under 3142(g), and that's the nature and circumstances of the offense charged in this being a crime of violence, assault on a federal officer, and also the history and characteristics of both defendants.

And the Government believes that both factors, the nature and circumstances of this offense and what happened on January 14th, support that both Mr. Aljorna and Mr. Sosa-Celis are a risk of nonappearance and a danger to the community.

As to Mr. Aljorna, Mr. Aljorna admitted to law enforcement that he knew that it was ICE officers that were attempting to stop him, he evaded a traffic stop, he failed to stop, and he led law enforcement officers on a high-speed chase that he admitted reached speeds of almost 80 miles per hour. He zigzagged through traffic. And he eventually crashed into a snowbank and fled on foot. And while he was fleeing on foot, he ignored officers' commands to stop.

He slipped on the ice and ended up on the ground. The deportation officer attempted to detain him, and he still resisted and he got free from that. And when he got free of the deportation officer's grasp, he -- instead of fleeing right away into the residence, he stopped, he turned around, he faced the deportation officer, grabbed a broom, and he proceeded to strike the deportation officer. And

that's what led to the deportation officer suffering a gash on his left hand.

And at that point, Mr. Sosa-Celis and Mr. Aljorna both then fled into the residence and barricaded themselves in there. And so that goes to risk of nonappearance. And the fact that they both assaulted the federal officer with a broom and a shovel just plainly goes to danger.

The -- as to the nature and -- as to the history and characteristics of both defendants, the Government is not asking the Court to step into and come to resolve an interagency dispute between two departments of the Executive Branch of government. Rather, the Government is simply arguing that both defendants are citizens of Venezuela, they're both subject to immigration detainers, and they are both -- the bond report indicates that both are subject to warrants of removal.

And faced with the choices of facing federal prosecution for assault of a federal officer and orders of removal, the risk of both defendants absconding is high. And so that pretty much sums up the Government's argument, Your Honor. If you have any questions for me.

THE COURT: Question, Counsel: Were these defendants, as they came to the U.S., were they given appearance dates, or did they -- forgive me -- there's an official term for this, but the colloquial is gotaways.

Which way did they come, do you know?

MR. KANASSATEGA: Your Honor, the Government is not aware of their immigration A-file.

THE COURT: Okay. That's fine. That's fine. Thank you.

MR. KANASSATEGA: Thank you, Your Honor.

THE COURT: Mr. Goetz, Ms. Wolpert.

Mr. Goetz.

MR. GOETZ: Good morning again, Your Honor. Your Honor, may I start with answering the last question the Court posed to --

THE COURT: Yeah, please do.

MR. GOETZ: -- my colleague?

The answer to the question is yes. I was able to review some immigration documents this morning that shows that -- and forgive me. I'm a criminal defense lawyer, so I might not get all the terms right, but that Mr. Aljorna --

THE COURT: We're in the same game, so --

MR. GOETZ: Okay.

THE COURT: -- there are lots of initials going on these days that neither of us have spent a lot of time with in the past.

MR. GOETZ: But he entered at -- he was an arriving alien. He made an appointment when he entered, I believe it was at Brownsville, Texas, and was then given

permission, an appointment to travel to Minnesota where he had an appearance on May 1, 2024, at the One Federal Drive, Suite 1850, Fort Snelling, Minnesota.

He made that appearance, and I show that he was ordered to appear on May 1, 2024, then given a subsequent notice for an in-person hearing on October 28, 2024. He made that appearance on November 1, 2024. I show that -- actually, he was given a notice for November 19, 2024, to provide biometric processing information. He supplied that.

And on October 28 of 2024, there was an order by an immigration judge. He was in removal proceedings at that time initiated by the Department of Homeland Security. And at that point, to quote from the order, "Party has requested administrative closure and the opposing party has not presented a persuasive reason why proceedings should not be administratively closed." And then the other box is checked, it said, "Respondent," that would be Mr. Aljorna, "has a pending application for temporary protected status and the Department of Homeland Security is not opposed."

So he made all of the proceedings up to that point. And I don't have the documents for this, but I believe the Pretrial Services Report indicates that because -- I believe he did have temporary protected status as a Venezuelan immigrant. That temporary protected status was changed, and he had an appearance in May of this year,

2025, and he made that appearance as well.

So bottom line, Your Honor, he has had multiple appearances in Immigration Court. He's made them all. He's had multiple requirements for Immigration Court, and he has met them all.

And I do have his A-number that I can provide the Court if there's any need to confirm this.

THE COURT: That's fine. That's fine. Thank you for that explanation.

MR. GOETZ: But the standard of review, of course, Your Honor, is de novo. But as the Eighth Circuit has recognized, that does not mean you treat Judge Micko's order as it doesn't exist and his findings as if they didn't exist. Judge Micko, after the full evidentiary hearing, carefully considered all of the Government's evidence, the very same arguments that counsel makes today, and found that there was a combination of conditions that reasonably assured Mr. Aljorna's appearance and the safety of the community.

The order of conditions of release has strict conditions: Supervised by Pretrial Services, travel restricted to Minnesota, he's on home detention with GPS monitoring.

I ask the Court affirm those conditions today and deny the Government's motion as it has not met its burden to

show that there are no conditions that can reasonably assure appearance and community safety.

The Court, I know, is absolutely familiar with the Bail Reform Act, but if it -- I think it bears emphasis, the act itself favors release over detention. The least restrictive conditions must be applied if they reasonably assure. This is not a presumptive detention case as well.

Also, I think, as the Eighth Circuit recognized in *Orta*, when we look at all the scheme of criminal cases that come before the District Courts, detention applies only in a fraction of those cases. And this is not one of those.

Let me first address the Government's concerns about community safety. And I would ask the Court to consider the 3142(g) factor of weight of the evidence in recognizing that that factor, that allegation does not warrant detention.

The allegation of community safety or that Mr. Aljorna is a threat to community safety comes from one individual, in essence, ERO Number 1. Those allegations are uncorroborated, they are from an individual with a powerful motive to fabricate, and they are contradicted by significant evidence. The only evidence that Mr. Aljorna has ever assaulted anybody in his life comes from this ICE agent.

I have indicated to the Court in our submission

that that ICE agent is presently under investigation by state and county officials for an unreasonable use of force.

That ICE agent claimed justification for his use of deadly force. Under, as the Court knows, *the Tennessee v. Garner* standard, is this claim that he was being assaulted by Mr. Aljorna and Mr. Sosa-Celis with a broom and shovel. That conduct did not happen according to other evidence.

And when we look at this case in the context of all too many cases that have happened in this district within the last few weeks and months, it is part of a disturbing pattern going to the highest level of the Executive Branch of government officials falsely accusing victims of assaults and attacks in order to justify unreasonable use of force, including deadly force. And that's what happened in this case.

Let me talk about the objective physical evidence first. Rather than showing that ERO Number 1 was being beaten with a shovel and broom when he fired a gun at them -- and that's -- that's the agent's claim -- the physical evidence, Your Honor, shows that Mr. Aljorna and Mr. Sosa-Celis were ten feet away inside their home with the door closed when that agent recklessly and callously shot at them.

The video surveillance evidence described in the

court testimony from the detention hearing, as well as the affidavit, does not at all corroborate this claim of being violently beaten with a shovel and a broom.

The incident is captured. We have the City of Minneapolis' Milestone video that captured the incident. But it does not at all show Mr. Aljorna striking again and again the agent with a broom.

How the agent sustained the gash on his hand, I can't tell the Court, but the evidence does not suggest it came from Mr. Aljorna at all.

The next inconsistent evidence is eyewitness testimony. The eyewitnesses to the incident do not support the agent's allegation. Even ERO Number 2, his partner, doesn't support the claim. He didn't see it so he can't say one way or the other.

But I've identified two or three witnesses, and counsel for Mr. Sosa-Celis has identified a fourth witness, G.H.L., all four of them, V.T.M., I.M.C., G.H.L. and the co-defendant do not support Mr. Aljorna's claim -- or the agent's claim that Mr. Aljorna was striking him with a broom.

So insofar as that is the main argument the Government makes for why he needs to be detained, because he's a risk to community safety because he assaulted a federal officer, the evidence on that count is weak. It is

not justified detention.

Then I'd ask the Court to briefly consider this incident in the context of his entire life. He's got no history of any crimes of violence. His only involvement with the Court have been two traffic matters. And the Court has that in the Pretrial Services Report. There's no history of drugs, involvement or use. There's no mental illness. In short, Your Honor, the conditions set by Judge Micko more than reasonably address any community safety concerns.

Turning to the risk of nonappearance, I understand the Government's argument to be in part, well, he has this immigration status. Insofar as that involves a detainer and a removal order, that involves a risk of flight. I respectfully disagree with counsel. I think there is an inconsistency between the positions the Government has taken. On the one hand, they're saying that we want to hold people accountable and prosecute individuals who have assaulted federal officers; but, on the other hand, they're saying, Well, we're going to remove Mr. Aljorna. He's subject to an ICE detainer.

That is a conflict that I know this Court has encountered before. I've cited the case Your Honor decided some 15 years ago plus. But that detention condition --

THE COURT: So I've got to remember that. That's

fine. I'm just kind of teasing about it.

MR. GOETZ: Yeah, and I know Judge Rosenbaum has spoke on that. I cited Judge Rosenbaum's decision. But the bottom line on that, Your Honor, is that his ICE detainer, any removal order, that should not go into this Court's consideration. It's not a 3142(g) factor.

The reality is, I think, that his -- though he did drive away from the officer in a car, his flight is evidence of fear. It is not evidence of nonappearance or risk of nonappearance.

I'd ask the Court to consider that when Mr. Aljorna fled, this was shortly after ICE agents had killed a woman in South Minneapolis, Renee Good. And the evidence will be, Your Honor, and we noted this in our written submissions as well as a transcript, that while Mr. Aljorna -- while this was all going on, his family was calling 911 so Minneapolis Police could respond to the scene so he could surrender to them because he felt he would be safe if he surrenders to Minneapolis rather than ICE agents.

That doesn't justify fleeing. I'm not saying he shouldn't have stopped. But I'm just trying to argue and point out how that's -- that's evidence of fear. It is not risk of flight, certainly a risk that shows he -- he has to be detained.

As I've indicated, he's completely fulfilled his

obligations to the Minnesota Courts, as well as the Immigration Courts. He does have ties to this community. His spouse V.T.M., though she's not here now, my understanding is she will be here imminently or shortly. He has a one-and-a-half-year-old son that is here.

And I submit, Your Honor, respectfully disagreeing with counsel, he has every reason to stay in Minnesota and see this case through. Arguably, he is a crime victim, someone who would be entitled and eligible for application for a special visa status under what's called a U visa. And the cite on that is 8 U.S.C. 1101(u). There are state agencies that are ready to support that application. The Minnesota Bureau of Criminal Apprehension and the Hennepin County Attorney's Office would support that application.

Arguably, there might be a claim for damages against ERO 1. And first and foremost, he wants to see that justice is done in this case.

So for all those reasons, Your Honor, I would ask that the Court deny the Government's motion and affirm Judge Micko's strict condition of release order.

THE COURT: Thank you, Mr. Goetz.

Ms. Wolpert.

MS. WOLPERT: Good morning, Your Honor.

THE COURT: Good morning.

MS. WOLPERT: I also have in my possession some

immigration documents. And Your Honor asked the question about Mr. Sosa-Celis's background, how he came to the United States and so forth. And what I do -- what I can tell the Court is that when he came over the border, and it was, I believe, in Texas, he did immediately apply for asylum and later applied for temporary protected status.

His application was approved, and it was valid from November 7, 2024, through April 2nd, 2025. And at some point after that, he did get a work permit.

So let me turn to the argument on behalf of Mr. Sosa-Celis. And we ask that the Court deny or reject the Government's motion.

Mr. Sosa-Celis was ordered released by Magistrate Judge Micko with particular conditions. And Your Honor has the order, I'm sure, but some of those conditions include be law-abiding; advise probation if you are changing your residence; submit to supervision; don't obtain a passport or foreign travel document; avoid contact with people who might be victims or witnesses in this case, including immigration enforcement; those kinds of things; stay in Minnesota, okay, unless approved by your probation officer.

Mr. Sosa-Celis believes these conditions are perfectly appropriate to secure his future appearance in these proceedings.

Now, the Government has argued that Mr. Sosa-Celis

is a risk of flight. And the primary argument that the Government asserts is that Mr. Sosa-Celis told Mr. Aljorna to come home when he was being chased by ICE agents.

Now, in terms of context, this occurred within one week after Renee Good was killed. Mr. Aljorna was being chased in an unmarked vehicle with men -- two men in masks. And Mr. Sosa-Celis's advice was nothing more than a recommendation of self-preservation and protection. And Mr. Goetz mentioned that it was driven by fear, and that is for sure the case. That recommendation may very well have saved Mr. Aljorna's life at the scene.

The Government maintains that Mr. Sosa-Celis fled inside the residence to evade the officer as the officer was shooting at him through the door of the house. I ask the Court to consider that this is an extraordinary claim. That fleeing into the house and shutting the door while an agent is firing a gun at you is instinctive, common sense, self-protective, and that does not show that Mr. Sosa-Celis won't show up to future court proceedings.

The Government also relies on the idea that Mr. Sosa-Celis' immigration status means that he will flee. But the certainty of deportation in light of the fact that there's an ICE detainer, the certainty of deportation does not here translate into the certainty of flight. And there's several reasons for that.

Number one -- and I know you've heard Mr. Goetz argue regarding, I would say, the skimpy evidentiary record. The evidence is less than compelling regarding my client. My client told my -- told Mr. Aljorna, Go home. My client stood in the doorway of the residence holding a shovel, an unremarkable thing in January in Minnesota.

My client, according to the Government, assaulted a federal officer, but the Government's own evidence, the Government's own evidence calls that into question. For example, at the evidentiary hearing, ERO Number 1, his testimony -- his statement was summarized by Special Agent Getsch, but no witness corroborated what ERO Number 1 said. No witness corroborated that any objects were being used. And Special Agent Getsch confirmed that the video surveillance did not show that the agent was struck by an object. I think that's critical.

THE COURT: Counsel, is it important that kind of testimony be corroborated?

MS. WOLPERT: Your Honor, it contradicts the testimony of -- or the statement of ERO Number 1. In other words, forget the word "corroborate." I would say that the video surveillance evidence contradicts ERO Number 1's testimony that he was struck by an object. And if that is contradicted by the neutral surveillance footage, then that's a significant fact. That's a significant fact.

There was no testimony that the gash on the agent's hand had anything to do with what Mr. Sosa-Celis had done. And so the weight of the evidence here is critical. It does not demonstrate that Mr. Sosa-Celis is a danger to a person or the community.

And, in fact, if you look at Mr. Sosa-Celis' criminal history in the Pretrial Services Report, it consists of traffic violations. There are no violent offenses. So Mr. Sosa-Celis urges the Court to conclude that the Government has not shown by clear and convincing evidence that he poses a danger to the community.

In terms of risk of flight, we talked about the Government's position that Mr. Sosa-Celis telling Mr. Aljorna to go home while he was being chased by ICE agents shows that Mr. Sosa-Celis will not show up to court. I fail to see the connection. The Government maintains that Mr. Sosa-Celis fled into the house while he was being shot. That doesn't demonstrate Mr. Sosa-Celis will not attend court proceedings.

And we also talked about the immigration status. And, Your Honor, you, as well as Judge Rosenbaum, have noted that the fact of a detainer is not under a defendant's control. We have to look at things that are volitional with respect to a defendant. And here there is no evidence that Mr. Sosa-Celis has any incentive to flee. Not only does he

strongly maintain his innocence, and not only is the Government's evidence against him slim, but three witnesses who were interviewed by the Government have not -- have stated that no objects were used and have confirmed that Mr. Sosa-Celis wasn't even in physical contact with the agent.

Now, Mr. Goetz alluded to the fact that his client may very well be a victim of a crime, so may Mr. Sosa-Celis. After all, he was shot through the door by an agent after the door was closed from ten feet away by an agent where there was no longer any danger to his personal safety. Raising questions, raising questions, Your Honor, regarding the reasonable use of deadly force.

THE COURT: Do you have a picture of that door?

MS. WOLPERT: I do not have a picture of the door, Your Honor, but it's my understanding that the BCA has recently gone to that scene and has confirmed that the shot went through the door. So I will see if I can get Your Honor a picture of that door. But shooting someone through the door, remember, there were two women in the house with very young children, around 1 to 2 years old, and there may have been other people in the house.

THE COURT: Counsel, that's not relevant.

MS. WOLPERT: Well, I ask the Court to consider this, if you are --

THE COURT: Why would I consider something that would not be known by anybody except the people involved?

MS. WOLPERT: The evidence indicates that the door was ajar when the women were looking -- watching the scene, and so there's reason to believe that the agent would have known that there were other people in the home.

THE COURT: Okay. Okay. That explains things.

MS. WOLPERT: Okay. And so what I'm saying is when you shoot a gun and it's going through -- the bullet is going through the door, it could have hit anyone. It happened to hit my client. Okay.

Now, we talked about risk of flight and why my client wouldn't flee. Well, not only does he maintain his innocence, not only is the Government's evidence against him slim and contradicted by the surveillance video, but, in fact, my client views himself as a crime victim. The BCA and the Hennepin County Attorney's Office also views my client as a crime victim. They have launched an investigation into this shooting.

And my client has every reason to file for a U visa application so that he may stay. It is possible, likely, that his ability to work with the BCA and the Hennepin County Attorney's Office will permit the Government, the state Government, to certify that application so that he has the opportunity to lawfully stay

in the United States, specifically Minnesota.

So all those facts, Your Honor, weigh heavily in favor of staying here; and, in fact, Mr. Sosa-Celis' entire life is here. His ex-wife is here with their young 1-year-old son. His current partner has just been released from ICE custody pursuant to a habeas petition that was recently granted.

THE COURT: Just a minute. Who are you talking about?

MS. WOLPERT: We refer to her as I.M.C. -- yes, I.M.C.

THE COURT: Oh, a personal relationship individual?

MS. WOLPERT: Correct. Correct.

THE COURT: Okay.

MS. WOLPERT: And, Your Honor, in the motion joining Mr. Aljorna's motion to prohibit the Government from deporting witnesses to this incident, we identify three pending or concluded habeas petitions that were filed by witnesses to this incident. In the habeas petitions, each person has a statement of what occurred during the incident on January 14. So I think it's instructive because it fleshes out more than what the Government's affidavit in support of the criminal complaint states, and it also fleshes out the investigation. One of the petitions by

G.A.H.L. contains an affidavit from Nicolai Lyfoung, Senior Special Agent of the Minnesota Bureau of Criminal Apprehension, who identifies the investigation that the BCA is currently conducting and his desire to interview various witnesses.

THE COURT: Counsel, counsel --

MS. WOLPERT: Yes.

THE COURT: -- this is a federal courthouse.

MS. WOLPERT: Pardon me?

THE COURT: This is a federal courthouse.

MS. WOLPERT: Correct.

THE COURT: All I've heard is BCA, state things. What do we get from the federal side? What do we get from the FBI?

MS. WOLPERT: We have not received any discovery yet from the Government, from the Federal Government. The Court did issue a *Brady* order. We have not received any discovery so we don't have witness statements here to inform the Court as to the Federal Government's evidence. We don't have the surveillance video from the night of the incident so we are left with a state investigation that is proceeding. And the petition -- the habeas petition of G.A.H.L. filed in Federal Court currently pending before Judge Tunheim contains facts relevant to the status of the BCA investigation.

Why am I telling you this, Your Honor? I'm telling you this because my client has every reason to cooperate with the BCA, has ever reason to believe himself a crime victim, has every reason to stay in Minnesota, will not flee, is not a danger to the community, and, therefore, we ask the Court to deny the Government's motion. Thank you.

THE COURT: Thank you very much.

Anything further from the Government?

MR. KANASSATEGA: Briefly, Your Honor.

Your Honor, I'll only -- these factual issues are certainly issues to be determined at trial. And so right now we are left with what we have. And so as to the danger to the community and the factor, weight of the evidence, I thought that I should address some of the assertions that my colleagues have raised, especially as to no corroboration of the assault. And I would not characterize the evidence as weak and I wouldn't characterize that there is no corroboration.

The affidavit states that both defendants here admitted that they either possessed a broom or a shovel, and Mr. Sosa-Celis admitted to law enforcement officers that he saw Mr. Aljorna what appeared to be attacking or attempting to strike the deportation officer.

As to the video evidence, the video evidence --

the affidavit states that the area in which the incident occurred was very dark and that law enforcement officers had to set up search lights around the area in order to conduct a investigation of the scene and officers remarked -- when the officers had to pull down the search lights, officers remarked at how dark the area was.

And as for the camera, the camera footage was moving. Apparently in the affidavit, it states that the camera was moving positions and it was in and out of focus. But what the camera does show is that three individuals were in an altercation and one individual was at least holding a shovel at the beginning of the altercation as the officer was chasing Mr. Aljorna.

And as to the -- when the gunshot occurred, one girlfriend stated that the gunshot occurred after the door closed. Another girlfriend said that she heard it -- the gunshot before the door shut. And a third witness, who is also a resident in that unit, stated that he didn't look outside until he heard a gunshot and saw someone wearing a tactical vest and a face mask chasing Mr. Aljorna. So --

THE COURT: Counsel --

MR. KANASSATEGA: Yes.

THE COURT: -- it would be pretty easy to figure out whether or not a bullet went through a door.

MR. KANASSATEGA: Yes, Your Honor.

THE COURT: Did it?

MR. KANASSATEGA: The Government has not received that discovery yet from the investigating agency.

THE COURT: Okay.

MR. KANASSATEGA: Yeah.

And, lastly, Your Honor, very quickly, the second law enforcement officer -- the second deportation officer was clearing the vehicle that Mr. Aljorna was driving to make sure that nobody else was in the vehicle and then he drove his vehicle up to the scene. And as he got out of his vehicle, he heard a gunshot, and so that would be the reason why the second deportation officer did not have a clear view as to the altercation.

And as to nonappearance, as my colleague noted, fear is not an excuse to flee from a -- flee from law enforcement, especially when you know that it's law enforcement. Thank you, Your Honor.

THE COURT: Thank you.

MR. GOETZ: Your Honor, if I may, I do have photographs of the door.

THE COURT: Oh, okay.

MR. GOETZ: And I just received these yesterday. May we approach?

THE COURT: You certainly may.

(Mr. Goetz, Mr. Kanassatega and Ms. Wolpert

approach the bench)

MR. GOETZ: You can toggle through them. That's the first one. And that's the -- this is inside, but these are the door.

(Discussion held off the record)

THE COURT: Okay. Thanks. Counsel, I'm going to request that you be kind enough to put those photographs onto some kind of paper and submit them to the Court.

MR. GOETZ: I will do that, Your Honor.

THE COURT: It's the first time I've seen an exhibit by computer, so I -- I'm old-fashion and need this (Indicating).

Okay. Anything further, Counsel, to come to our attention?

MR. GOETZ: The only other matter, Your Honor, is I do have a motion in the nature of preserving evidence, specifically witness availability.

THE COURT: So ordered.

MR. KANASSATEGA: Nothing further from the Government, Your Honor.

MS. WOLPERT: Nothing further, Your Honor.

THE COURT: Okay. Thank you. Well, Counsel, this matter comes to the Court's attention on an appeal of Judge Micko's order. And I think we need to take into consideration that Judge Micko has held an evidentiary

hearing with respect to the subject so he was in a better position to determine credibility. The Court today is not in a position to do or say much about that.

The presentations today, for which I commend you, Counsel, you're good advocates, but the reality is the arguments are wrought with hearsay. And I have real difficulty trying to even get to a concept of credibility with respect to it.

The next thing I would talk about is for this Court to overrule Judge Micko, that needs to be by clear and convincing evidence. The next thing that comes into that is that in a bond matter, the Court is compelled to permit bond or to permit the least restrictive -- or I'm sorry, the opposite. If bond is granted, the most restrictive things necessary to accomplish it; but, otherwise, to grant -- grant the bond which is favored within the system.

In this case, it's very clear to this Court that there was an assault. Nevertheless, an assault is not necessarily grounds of detention.

Secondly, it's very clear in this case that there was an attempt to flee police officers. Again, that is not necessarily grounds of detention. Both of which can and often are grounds of detention.

Finally, I come to the conclusion in a couple of things -- well, strike that "finally."

I'm also concerned that the question I asked counsel about -- I'm very concerned that somehow inadvertently we're driving a wedge in law enforcement between the sovereignty of the United States and the sovereignty of a state. It's highly inappropriate, and, yet, I understand counsel making the arguments that they're making because I think they're compelled to do so. But it's a difficult problem.

Finally, I come to the point of discussing these two defendants and the conditions that are necessary that would permit release. I come to the conclusion that I do permit release, and the reason I do that is both of them, pursuant to the restrictions that are placed on them by Judge Micko's order, which I find not to be clearly erroneous, that simply the very, very restrictive status of having monitoring, a so-called bracelet, will keep the defendants within the jurisdiction of this state, within the jurisdiction of this court, and, therefore, I'm going to order that Judge Micko's order be affirmed.

I will tell you that that is not a cut-and-dried, easy decision; but I think the world of fairness dictates that at this circumstance, no one at this time requires the comments that are made. I -- is there anything further to come to my attention?

Hearing none.

MR. GOETZ: Nothing from Aljorna, Your Honor.

MS. WOLPERT: Nothing, Your Honor.

MR. KANASSATEGA: Nothing further from the Government, Your Honor. Thank you.

THE COURT: Okay. Thank you very much. We stand in recess pending the next round of whatever it is.

(Court adjourned at 11:48 a.m.)

* * *

I, Erin D. Drost, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

Certified by: *s/ Erin D. Drost*

Erin D. Drost, RMR-CRR